UNITED STATES

v.

**Alvin N. CUENTO, Aviation Structural Mechanic (Structures) Second Class (E–5), U.S. Navy.**

NMCM 200100281.

U.S. Navy–Marine Corps Court of Criminal Appeals.

Sentence Adjudged 6 July 2000.

Decided 20 Feb. 2003.

LT Thomas P. Belsky, JAGC, USNR, Appellate Defense Counsel.

LT Ross W. Weiland, JAGC, USNR, Appellate Government Counsel.

Before Price, Senior Judge, Carver, and Bryant, Appellate Military Judges.

PRICE, Senior Judge:

Based on mixed pleas, the appellant was convicted by a general court-martial of assault and battery upon a child (M) under 16 years of age and two specifications of indecent acts with a child (J) under 16 years of age, in violation of Articles 128 and 134, Uniform Code of Military Justice, 10 U.S.C. §§ 928 and 934.[1] A panel consisting of officer and enlisted members sentenced the appellant to confinement for four years and a dishonorable discharge. The convening authority approved the sentence as adjudged, then waived automatic forfeitures in favor of the appellant's family.

We have carefully considered the record of trial, the Petition for New Trial, the assignments of error,[2] the Government's responses,

---

1. In Specification 2 of Charge I, the appellant was charged with "touching [J's] vaginal area and inserting his fingers into her vaginal area, attempting to force her to touch his penis, touching her breasts, and by climbing on top of her and rubbing his body on hers," with the intent to gratify his sexual desires. After a motion for finding of not guilty was partially granted and the members made findings by exceptions, the appellant was convicted only of touching her vaginal area and inserting his fingers into her vaginal area.

2. I. TRIAL COUNSEL COMMITTED PLAIN ERROR BY COMMENTING ON APPELLANT'S SIXTH AMENDMENT RIGHT TO COUNSEL WHEN HE ELICITED EVIDENCE THAT APPELLANT RECANTED HIS ALLEGED ADMISSIONS AFTER CONSULTING AN ATTORNEY, AND THEN COMMENTED ON THIS EVIDENCE DURING CLOSING ARGUMENT.
II. THE MILITARY JUDGE COMMITTED PLAIN ERROR AND DENIED APPELLANT DUE PROCESS IN ALLOWING THE GOVERNMENT TO INTRODUCE EVIDENCE INDICATING THAT ANOTHER JUDICIAL BODY HAD ALREADY FOUND THAT APPELLANT COMMITTED THE MISCONDUCT ALLEGED IN THE SPECIFICATIONS UNDER CHARGE I.
III. THE GOVERNMENT DEPRIVED APPELLANT DUE PROCESS BY OBTAINING EVIDENCE AGAINST HIM IN A MANNER THAT "SHOCKED THE CONSCIENCE."
IV. THE GOVERNMENT'S EVIDENCE IS FACTUALLY AND LEGALLY INSUFFICIENT TO SUPPORT A FINDING THAT APPELLANT SEXUALLY ABUSED THE COMPLAINING WITNESS.

the appellant's Reply Brief, and the oral arguments. In summary, the appellant's assignments of error and the Petition for New Trial focus on two central themes: (1) the Government's strategy and tactics in investigating and prosecuting the indecent acts; and (2) the relative credibility of the appellant and J in describing the indecent acts during their testimony.

We conclude that the findings and the sentence are correct in law and fact, and that no error materially prejudicial to the substantial rights of the appellant was committed.[3] Arts. 59(a) and 66(c), UCMJ, 10 U.S.C. §§ 859(a) and 866(c). Additionally, we have considered the Petition for New Trial and deny it. Art. 73, UCMJ, 10 U.S.C. § 873.

### Facts

The appellant is a native of the Philippines. At trial, he was a second class petty officer with more than 19 years of active duty service. He was charged with beating his eight-year-old son M once and with fondling his eleven-year-old daughter J on two occasions. The appellant plead guilty to the single specification of assault and battery upon M and not guilty to the two specifications of indecent acts with J.

In August 1997, Mrs. Cuento, the appellant's wife and mother of their three children (including M and J), moved out of the family home due to marital problems. The appellant retained physical custody of the three children. The appellant was a strict parent who refused to allow J much freedom. Because Mrs. Cuento was not as strict, J preferred to live with her.

In October 1997, the appellant touched J on her vaginal area, then told her not to tell anyone. A few days later, the appellant asked J to come into his room. She did so, then fell asleep on his bed. When she awoke, the appellant was touching her again in the same place in the same manner. J began to cry, prompting the appellant to stop and warn her not to tell anyone what happened.

For nearly a year, J did not tell anyone what happened. In August 1998, Mrs. Cuento returned to the family home, apparently with the intention of living there permanently. The appellant did not want her to stay and argued with Mrs. Cuento about the situation. Afraid that her mother was "leav[ing] for good" this time, J told her mother that the appellant had sexually abused her. Record at 595.

The San Diego Police Department initiated an investigation into J's allegation. The appellant was removed from the family home and restrained from contacting his children. The police interrogated the appellant twice. During the interrogations, the appellant denied any intentional sexual fondling of J. According to the appellant, he was wrestling with J when he tried to push her off him. In doing so, his hand went under her clothing and caught in her underwear. The appellant tried to remove his hand and her underwear came partly down her legs. The appellant admitted that J told him his finger went inside her and he said he apologized.

Within a month of J's initial report to Mrs. Cuento, J was examined by Dr. Horowitz, the Director of the Sexual Assault Response Team at Naval Medical Center, San Diego. Dr. Horowitz found no evidence of any injury to J. Dr. Horowitz later testified that her findings did not prove or disprove that J had suffered any sexual abuse.

While the criminal investigation continued, officials of the Navy Family Advocacy Program and the California Child Protective Service (CPS) coordinated the creation of a "reunification plan" for the appellant and his

V. TRIAL COUNSEL COMMITTED PLAIN ERROR WHEN HE: (1) PRESENTED THE TESTIMONY OF AN EXPERT WITNESS WHO COMMENTED ON APPELLANT'S CREDIBILITY, AND (2) RELIED ON THIS EVIDENCE DURING CLOSING ARGUMENT.
VI. TRIAL COUNSEL COMMITTED PLAIN ERROR DURING CLOSING ARGUMENT WHEN HE IMPERMISSIBLY STATED HIS PERSONAL OPINION REGARDING THE CREDIBILITY OF THE COMPLAINING WITNESS' TESTIMONY.
VII. THE DOCTRINE OF CUMULATIVE ERROR MANDATES THIS COURT DISAPPROVE THE FINDINGS WITH RESPECT TO CHARGE I AND THE SPECIFICATIONS THEREUNDER.

3. Although not assigned as error, we note one discrepancy in the court-martial promulgating order and will order appropriate relief.

family. Generally speaking, the officials hoped that the appellant would confess to the alleged sexual abuse and that he would actively participate in group and individual therapy. Upon successful completion of all requirements of the plan, the appellant would then be eligible for reunification with his family. Pursuant to this plan, the appellant began group counseling with Mr. Martin, a psychotherapist. The appellant faithfully attended these group counseling meetings from the summer of 1999 until the spring of 2000.

After consideration of the police investigation, the local district attorney declined to prosecute the appellant. At that point, in September 1999, the Naval Criminal Investigative Service (NCIS) assumed control of the investigation.

Meanwhile, the appellant continued to participate in the group counseling sessions. In January 2000, the appellant began to meet with Dr. Barnes, a clinical psychologist, for individual therapy. He met with Dr. Barnes on a weekly basis in January and February.

By the end of January 2000, the appellant had been questioned by the police and counseled on numerous occasions without admitting culpability. However, in mid to late February 2000, the appellant came into Mr. Martin's office and made a vague admission that his daughter's allegations were true.

On 24 February 2000, NCIS Special Agent Nelson contacted the appellant and asked him to come into the NCIS office for questioning. The appellant complied, indicating that he wanted to talk with NCIS. After an appropriate rights advisement and waiver, the appellant described the same incident of wrestling with J as he had described to the police. Special Agent Thomas, who assisted Special Agent Nelson with the interrogation, told the appellant he didn't believe him. After a few minutes of discussion, the appellant tearfully confessed to inserting his finger in J's vagina twice in October 1997. The appellant then said that it felt like a huge burden or weight had been lifted off his back and that he didn't have to lie about it anymore. The appellant signed a written confession,

which was later admitted into evidence as Prosecution Exhibit 20.

On 28 February 2000, during his eighth meeting with Dr. Barnes, the appellant admitted that he sexually abused J, as she had alleged. In making that admission, the appellant was distressed and upset. One week later, during the ninth meeting, the appellant did not change his story. However, on 13 March 2000, during their tenth meeting, in a state of agitation, the appellant told Dr. Barnes that he wanted to change his story. He explained that he had met with his attorney and that he had been lying to Dr. Barnes at the last two counseling sessions. He expressed to Dr. Barnes that he was afraid of going to the brig.

Charges were preferred against the appellant on 28 February 2000. According to the charge sheet, the appellant was notified of the charges on 28 March 2000.

At trial, after J testified that the appellant had fondled her, the appellant took the stand and denied any deliberate molestation. Instead, the appellant claimed that he was wrestling with the children and his hand accidentally hit J's private area. Following his conviction, the appellant was sentenced on 6 July 2000. He was immediately placed in confinement. On 12 December 2000, the convening authority approved the sentence and waived automatic forfeitures in favor of the appellant's lawful dependents.

On 10 January 2001, Mr. Douglas Brown, a civilian attorney representing the appellant during post-trial review, placed a telephone call to J. During a two-minute conversation, Mr. Brown asked J if she had told the truth or lied at trial when she testified that she had been molested by her father. She said that she had lied and would be willing to write a statement and speak with Mr. Brown's investigator. On 16 January 2001, J and her mother met with investigator Suzanne McDaniel. In the course of a 90-minute interview, most of which was transcribed verbatim,[4] J recanted her trial testimony and stated that she had lied at trial in

---

4. In Ms. McDaniel's declaration, she explains that she tape-recorded the interview. Toward the end of the interview, the tape recorder malfunctioned. The last 15 minutes of the interview was neither recorded nor transcribed.

accusing her father of molesting her. She also signed an affidavit to that effect.

### Factual and Legal Sufficiency of Evidence

■ The appellant contends that the evidence is both factually and legally insufficient to sustain the findings of guilty of indecent acts under Specifications 1 and 2 of Charge I. We disagree.

This court's standard of review for sufficiency of the evidence is set forth in Article 66(c), UCMJ:

> (c) In a case referred to it, the Court of Criminal Appeals may act only with respect to the findings and sentence as approved by the convening authority. It may affirm only such findings of guilty, and the sentence or such part or amount of the sentence, as it finds correct in law and fact and determines, on the basis of the entire record, should be approved. In considering the record, it may weigh the evidence, judge the credibility of witnesses, and determine controverted questions of fact, recognizing that the trial court saw and heard the witnesses.

Further, this standard and its application have been recognized and defined by the Court of Appeals for the Armed Forces:

> [U]nder Article 66(c) of the Uniform Code, 10 U.S.C. § 866(c), the Court of [Criminal Appeals] has the duty of determining not only the legal sufficiency of the evidence but also its factual sufficiency. The test for the former is whether, considering the evidence in the light most favorable to the prosecution, a reasonable factfinder could have found all the essential elements beyond a reasonable doubt. *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979). For factual sufficiency, the test is whether, after weighing the evidence in the record of trial and making allowances for not having personally observed the witnesses, the members of the Court of [Criminal Appeals] are themselves convinced of the accused's guilt beyond a reasonable doubt.

*United States v. Turner,* 25 M.J. 324, 324–25 (C.M.A.1987).

In making such factual determinations, we are guided by the principle that reasonable doubt does not mean the evidence must be free from conflict. *United States v. Roberts,* 55 M.J. 724, 731 (N.M.Ct.Crim.App.2001), *rev. denied,* 56 M.J. 467 (2002); *United States v. Lips,* 22 M.J. 679, 684 (A.F.C.M.R. 1986). "[T]he factfinders may believe one part of a witness' testimony and disbelieve another. *United States v. Harris,* 8 M.J. 52, 59 (C.M.A.1979). So, too, may we. Art. 66(c), UCMJ." *United States v. Lepresti,* 52 M.J. 644, 648 (N.M.Ct.Crim.App.1999).

With those legal principles in mind, we consider the appellant's specific arguments. He first asserts that J's testimony is incredible because she had a motive to fabricate a story about him molesting her. According to this line of reasoning, J did not like living with her father because he was strict with her and so J looked for an opportunity to live with her mother. J knew that she would be removed from her father's custody if she accused him of sexual abuse.

The Government responds that J was afraid to stay with her father for fear of future abuse. When it appeared that she might be left with him for the foreseeable future, she reported what he had done to her.

In our review of the record, we note that both theories of J's motive have some evidentiary support in her direct and cross-examination. However, we believe that the Government's theory is more compelling. In redirect examination, J testified that she would not make up allegations of sexual abuse just because her father was stricter than her mother. She also explained that if her mother left for good, it (sexual abuse) could happen again. Finally, we note that J emphasized that she was "very sure" that the appellant had touched her on his bed and that she was telling the truth. Record at 624–28. J's testimony in the recross and members' examinations cast no doubt on her professed motive for reporting her father. After careful consideration, we are persuaded that J testified truthfully in her accusations against her father and that she made the initial accusation because she was afraid he would molest her again.

The appellant also contends that J's testimony is not worthy of belief because it is inconsistent with statements she gave to investigators and counselors and because she could not remember various aspects of the incidents in question. We note that J was testifying about incidents that occurred nearly three years earlier. To expect perfect consistency among her pretrial statements given to various investigators and counselors and her trial testimony over that three year period of time is unrealistic. We believe that the lapse of time tends to explain her inability to remember every detail about which she was questioned. As we have scrutinized J's testimony, as well as all other relevant portions of the record, we find nothing that calls into question her credibility regarding the key elements of her testimony.

We note that J candidly admitted that she lied to her mother on occasion. We also have considered the testimony of her grandmother and her brother that she is not a truthful person. However, as we determine J's credibility from the pages of a cold record, we "recogniz[e] that the trial court saw and heard the witnesses," a factor that plays prominently in our deliberations. Art. 66(c), UCMJ.

The fact that the appellant confessed to molesting J fortifies our conclusion that she testified truthfully at trial. We reject the appellant's claim that his confession was coerced based on his fear that he would not see his children again if he did not admit to wrongdoing. The appellant admitted that NCIS did not refer to his children during his interrogation. Both agents testified that the appellant broke down and cried as he confessed, then said that he was relieved that he didn't have to lie about it any more. We are convinced that the appellant confessed to NCIS and others because he had molested J and wanted to try to rid himself of his feelings of guilt.

We are also convinced that the appellant lied during his testimony in denying that he ever molested J. Our review of his self-serving testimony leads us to believe that the appellant used his desire for family reunification merely as an excuse for explaining why he would tell four people that he had molested his daughter. In short, we find that the evidence was legally and factually sufficient to sustain the appellant's conviction and we ourselves are convinced of his guilt beyond a reasonable doubt.

### Petition for New Trial

On 23 January 2002, the appellant filed a petition for new trial with the Judge Advocate General based upon fraud committed upon the court-martial. *See* Art. 73, UCMJ; Rule for Courts–Martial 1210, Manual for Courts–Martial, United States (2000 ed.). Since this case had previously been docketed with this court for review under Article 66, UCMJ, the Judge Advocate General forwarded the petition for our consideration and decision. R.C.M. 1210(e).

The petition for new trial alleges that J committed fraud upon the trial court and committed perjury in testifying that the appellant had molested her. The allegation is premised upon J's post-trial affidavit and her lengthy interview with the investigator working for the appellant's civilian defense counsel. In the affidavit and interview, J asserted that she had lied at trial.

A petition for a new trial may be filed within two years after the convening authority's action based upon newly discovered evidence or fraud on the court. Art. 73, UCMJ; R.C.M. 1210(a). Our superior Court has summarized the case law regarding petitions for new trial:

Petitions for new trial "are generally disfavored." *United States v. Williams*, 37 MJ 352, 356 (CMA 1993). . . .

[*United States v.*] *Bacon*[, 12 M.J. 489 (C.M.A.1982) ] set out the standard for ruling on a petition for new trial. In *Bacon* this Court held that "the determination of sufficient grounds for granting a petition for new trial in the military rests 'within the [sound] discretion of the authority considering ... [that] petition.'" 12 MJ at 492 (citations omitted). When a petition for new trial is considered by a Court of Military Review (now Court of Criminal Appeals), "the Courts of Military Review have the 'prerogative' of weighing 'testimony at trial against the' post-trial evidence 'to determine which is credible.'" *Id.*

The Courts of Criminal Appeals "are free to exercise ... [t]heir factfinding powers." *Id.* The only limit on their factfinding powers is that their "broad discretion must not be abused." *Id.*

Congress intended that military practice with respect to petitions for new trial mirror practice in federal civilian courts. *Williams,* 37 MJ at 356 n. 3. In federal civilian practice, "[t]he evidence which serves as the basis for such a motion [for a new trial] may be judged by the reviewing body both in terms 'of credibility as well as of materiality.'" *Bacon,* 12 MJ at 492, quoting *Jones v. United States,* 279 F.2d 433, 436 (4th Cir.1960); *United States v. Maddox,* 444 F.2d 148, 152 (2d Cir.1971); *United States v. Gantt,* 298 F.2d 21 (4th Cir.1962).

In federal civilian practice, "[g]enerally, a motion for new trial may be decided upon affidavits without evidentiary hearings." *United States v. Metz,* 652 F.2d 478, 481 (5th Cir.1981); *accord United States v. Montilla–Rivera,* 115 F.3d 1060 (1st Cir.1997); *United States v. Green,* 89 F.3d 657 (9th Cir.1996); *United States v. Johnson,* 12 F.3d 827 (8th Cir.1994); *United States v. Blackburn,* 9 F.3d 353 (5th Cir.1993); *United States v. Hedman,* 655 F.2d 813 (7th Cir.1981); *United States v. Herman,* 614 F.2d 369 (3d Cir.1980); *United States v. Turner,* 490 F.Supp. 583 (E.D.Mich.1979).

Petitions for new trial based on a witness's recantation "are not viewed favorably in the law." *United States v. Giambra,* 33 MJ 331, 335 (CMA 1991). They should not be granted unless "[t]he court is reasonably well satisfied that the testimony given by a material witness is false." *Id.,* quoting *Larrison v. United States,* 24 F.2d 82, 87 (7th Cir.1928).

Recantations of trial testimony are viewed by federal courts with "extreme suspicion." *United States v. Nixon,* 881 F.2d 1305, 1311 (5th Cir.1989); *United States v. Santiago,* 837 F.2d 1545, 1550 (11th Cir.1988); *United States v. DiPaolo,* 835 F.2d 46, 49 (2d Cir.1987); *Moore's Federal Practice,* § 633.05[5][a] (3d ed.1998); *see also Olson v. United States,* 989 F.2d 229, 231 (7th Cir.1993)(recantation treated "with skepticism"); *United States v. Carbone,* 880 F.2d 1500, 1502 (1st Cir.1989)("considerable skepticism"); *United States v. Ahern,* 612 F.2d 507, 509 (10th Cir.1980) (recantation "looked upon with downright suspicion"); *United States v. Lewis,* 338 F.2d 137, 139 (6th Cir.1964); Charles Alan Wright, *Federal Practice and Procedure* § 557.1 at 350 (1982)("utmost suspicion").

*United States v. Rios,* 48 M.J. 261, 267–68 (1998), *cert. denied,* 525 U.S. 1156, 119 S.Ct. 1063, 143 L.Ed.2d 67 (1999).

We hold that the appellant has not met his burden of showing that J's trial testimony was false. While we do not place too "onerous [a] burden on ... petitioner [to prove his entitlement to a new trial] when the alleged perjurer is the prosecutrix herself," *Giambra,* 33 M.J. at 335, we note that, unlike *Giambra,* this is not simply a "swearing contest" between J and the appellant. After J freely and credibly testified, her testimony was corroborated by: (1) the admission of the appellant's oral and written confession to NCIS; and (2) testimony of the appellant's admissions to Mr. Martin and Dr. Barnes.

Additionally, the circumstances surrounding J's recantation tend to cast doubt upon the veracity of her statements to Mr. Brown and Ms. McDaniel. We note that J did not come forward on her own accord to make this recantation. Neither did she go to a neutral party. Instead, a civilian attorney representing the appellant contacted her and set up an interview with the attorney's investigator so that she could make the recantation. "These circumstances reinforce rather than attenuate the extreme suspicion with which post-trial recantations should be viewed." *Rios,* 48 M.J. at 269.

When asked why she was recanting her trial testimony, J gave a number of reasons. From the transcript of her interview with Ms. McDaniel, Petition for New Trial, Appendix C, we now quote:

Ms. McDaniel: So why did you say in court that he did [touch you intentionally]?

[J]: Well, when I told my mom, we were— we—me and my brothers lived with her for three years, then all of a sudden they

bothered us with this whole court thing three years later after I accused him of it. And then I was scared and I didn't want to, but we got subpoenaed and I had no choice but to stick with the story that I was with for three years. So I just continued on.

Ms. McDaniel: Why did you not have a choice to say no, that didn't happen or yes, that did happen? Why didn't you have the c`oice to tell the truth?

[J]: I don't know. I was scared.

Ms. McDaniel: Of whom?

[J]: I have no idea.

. . . .

Ms. McDaniel: Does that make sense to you?

[J]: No. I just—I don't know. I was scared. I didn't—I did while I was—I did what I was doing for three years. I stuck with the same story. I don't know.

. . . .

Ms. McDaniel: How long was he convicted—sentence? How long was his sentence?

[J]: His sentence?

Ms. McDaniel: Uh-huh.

[J]: I'm not sure. I think he was supposed to get deported because he wasn't a citizen. But I think it was for 10 years.

Ms. McDaniel: So you anticipate that he's going to be deported; is that what you're telling me.

[J]: Yeah, I'm thinking so.

. . . .

Ms. McDaniel: And how do you feel about that?

[J]: He has family in the Philippines. It's just that—I don't know.

Ms. McDaniel: Why three years later did you decide to change your story?

[J]: Because, I don't know, I just felt too guilty and I couldn't stand it anymore.

Ms. McDaniel: Have any family members suggested that perhaps you should come forward and tell the truth?

[J]: No. No one knows until—they didn't know, really, until I talked to the attorney and he asked me to meet with him.

. . . .

Ms. McDaniel: He's the first one that you had any conversation with about this not being true?

[J]: Well, my family told me—they asked me, like—they told me about the hearing on the 22nd, I think. And they told me that the attorney wanted to talk to me, so I guess someone called. He called or they called him and they gave me the phone. And then Mr. Brown was talking to me and then I told him.

Ms. McDaniel: You told him what?

[J]: I told him that it—whatever my dad did to me was not true, because (indiscernible)—because it was my dad's last chance.

Ms. McDaniel: Last chance for what?

[J]: The hearing on the 22nd.

Ms. McDaniel: The last chance for the hearing, but what do you think would happen at the hearing?

[J]: I have no idea, but . . .

Ms. McDaniel: But?

[J]: I don't know.

. . . .

Ms. McDaniel: And then, three years later, you decided you didn't want that story anymore.

[J]: No.

Ms. McDaniel: "No" what?

[J]: No, I don't, because my conscience—I don't know.

. . . .

Ms. McDaniel: So now, now you want to change that story. What is causing you to change that story?

[J]: I don't want my dad in jail. I never wanted him in there in the first place.

. . . .

Ms. McDaniel: Are you concerned about him being deported?

[J]: I don't want him to be deported. I don't want him to be in jail. He's not having a good time in jail.

Ms. McDaniel: How does the rest of the family feel about that? Do they also want him to be out or do they want him deported?

[J]: Everyone wants him to be out. No one wants him to be deported, but no one came to me asking me for help. I just did this on my own. They didn't even know that I heard them talking amongst themselves.

. . . .

Ms. McDaniel: Is there any concern in your mind or worry about his losing his pension or being deported?

[J]: I don't want him to be deported. What's pension? Pension?

Ms. McDaniel: You know, like when you retire, you get money for having worked for so long?

[J]: No. I didn't know about that.

Ms. McDaniel: If he did lose his pension, how would you feel about that?

[J]: Even worse, because I just ruined his life.

Transcript at 19, 20, 22–24, 29, 35–36, 38–39.

Based upon these statements and our review of the rest of the petition, the appendices to the petition and the remainder of the record, we find that J felt guilty that she was responsible for the appellant being in confinement. She didn't want him to stay in the brig any longer and she did not want him to face deportation to his native country. We also find that her passing reference to a post-trial attack of conscience was nothing more than a confused notion that she should not have reported the indecent acts and because she did make the report, she was now responsible for his confinement and possible deportation.

After careful consideration of the petition for new trial, particularly the transcript of J's interview with Ms. McDaniel, as well as the entire record, we are not "reasonably well satisfied" that J's trial testimony was false and fraudulent. *Giambra,* 33 M.J. at 335.

### Comment on 6th Amendment
### Right to Counsel

The appellant contends that the trial counsel: (1) improperly elicited testimony from Dr. Barnes that the appellant recanted his earlier admissions to Dr. Barnes after consulting with his attorney; then (2) compounded that error by mentioning that attorney consultation in his argument on findings.

We conclude that the trial counsel did not improperly elicit this testimony. We hold that his argument was improper but find no material prejudice flowing from either the witness examination or the argument.

During the direct examination of Dr. Barnes, the trial counsel engaged the witness as follows:

Q: Okay. Now, when, if ever, did the accused actually recant his version?

A: The following week, so two weeks after his initial disclosure of molest he came in a state of agitation and told me that he wanted to again change his story.

Q: Well, let's talk in a little bit more detail about exactly what he told you on that date. What did he tell you?

A: He told me several things, *that he had met with his attorney and he was told that—let me back up.*

Q: Okay.

A: *I'd like to strike that, if I could.* It's important to get the sequence of events. He told me that he had been lying to me for the previous two weeks and that he now wanted to set the record straight one more time, that he reverted to the allegation that the abuse to his daughter occurred in an accidental fashion, as he had reported to me for the first seven weeks of therapy.

Record at 1031–32 (emphasis added). The trial counsel asked one more innocuous question of the witness and concluded his direct examination. We note that he did not follow the witness' reference to an attorney consultation with additional questions. However, in cross-examination, the trial defense counsel immediately did.

Q: I believe we talked on the phone before. I'm Lieutenant [G]. Now, sir, I have a few questions I want to ask you, but first—about what he said. But, first I want to ask you: You said you met with him two weeks later and he went back to the story that he had originally gave; that was the wrestling story, right?

A: That is correct.

Q: *And you mentioned that he had met with his attorney?*

A: Yes.

Q: Would that be me?

A: Yes, it would.

Q: Okay. And the first time you met with him was 28 February, right?

A: That's correct.

Q: Two weeks later would have been what day?

A: I apologize for not having my file. I think it's March 13th.

Q: March 13th.

A: It could be the following week. I don't—again, I don't have access to my file.

Q: Okay. Would it surprise you to know, sir, that Petty Officer Cuento did not meet with his attorney until after that?

A: It would only surprise me that I have the date wrong. When he met with me and revised his story, he had met with an attorney. It may not have been you, sir, but he had met with an attorney, at least that's what he reported to me at that time, and he started expressing fear that he would be placed in the brig. That was a new story to me on that day.

Q: Do you know of any other attorney that he's ever had?

A: I don't know.

*Id.* at 1032–34 (emphasis added). The trial defense counsel then moved on to another line of questioning.

While it is true that the first reference to an attorney consultation came during direct examination by the trial counsel, it was a passing reference that the witness attempted to retract. The trial defense counsel obviously didn't think it was prejudicial. Not only did he fail to make any objection, he chose to lead off his cross-examination of this significant rebuttal witness by focusing on the attorney consultation. In doing so, he skillfully undercut Dr. Barnes' memory of the events.

■ In the absence of any objection, we evaluate the trial counsel's witness examination for plain error. *United States v. Powell,*

49 M.J. 460, 464–65 (1998). Based on the foregoing extract from the record, we are not convinced that the *trial counsel* elicited testimony concerning the attorney consultation. The *witness* volunteered that particular detail. If any attorney must be held accountable, we conclude that it must be the trial defense counsel.[5] Even if the *trial counsel's* direct examination constituted error, we do not think it was clear or obvious. Finally, for the reasons stated previously, we discern no material prejudice to any substantial right of the appellant.

■ During the trial counsel's closing argument on findings, he made the following comments:

Members, you've heard from Dr. Barnes. He came in last Friday, and he gave you a real good glimpse as to exactly what was going on here. And if you bring in all the other evidence that you've heard, it makes perfect sense. You've got a man that comes into his office on the 28th of February, four days after he speaks with NCIS, on the 28th of February, and says, "I'm guilty." Another week goes by, on the 6th of March or sometime around there, he comes back into the office and says, "Doc, I'd like to talk with you a little bit more about it. I'm guilty, and the reason that I'm telling you now is because the burden is so great." And then another week goes by. He comes back in, and he says, "*Well, now, I've spoken with my defense attorney*; and now I'm—I don't want to be guilty anymore. I'm going to recant. No longer am I going to say I did this."

Record at 1149 (emphasis added). The trial defense counsel made no objection. Since there was no objection, in the absence of plain error, the issue was forfeited. *United States v. Carpenter,* 51 M.J. 393, 396 (1999). While we would normally conduct plain error analysis at this point, under the facts of this case, we need not do so because we are satisfied beyond a reasonable doubt that any error was harmless. *Id.* at 397.

---

5. Lest we be misunderstood, we do not cast any aspersions upon the trial defense counsel. Rather, as we noted previously, the trial defense

counsel shrewdly used the witness' inadvertent reference to his advantage.

We first note that the trial counsel did not ask the members to infer that the appellant was guilty because he chose to exercise his constitutional right to consult with counsel. Rather, he simply argued other permissible inferences resulting from the trial defense counsel's cross-examination of Dr. Barnes. Indeed, given the credible testimony of J, the appellant's admissions to Mr. Martin and Dr. Barnes and his oral and written confessions to NCIS, the trial counsel didn't have to ask the members to make such an improper inference. The Government presented a strong case to the members, a case that was opposed by a weak case from the defense centered upon the appellant's attempted retraction of his confession. We also note that this one-time reference to the attorney consultation occurred in the course of prosecution arguments occupying a total of 19 pages in the record. Based on our evaluation of the entire record, we conclude that the appellant suffered no material prejudice to a substantial right from this rebuttal argument.

### Evidence of Prior Conviction

■ The appellant contends that the military judge committed plain error and denied the appellant due process in allowing the Government to introduce evidence that another judicial body had already found that the appellant had committed the charged misconduct. The Government argues it was the appellant and his counsel, not the trial counsel, who first elicited testimony of a prior adjudication by another judicial body. After careful review of the record, we concur with the Government and find no plain error.

During the Government's case-in-chief, the trial counsel questioned Ms. Peggy Cohen, a social worker for the Navy Family Advocacy Program. On direct examination, Ms. Cohen testified concerning her interview with the appellant in September 1999. The appellant gave Ms. Cohen the same explanation that he had previously given the police and other counselors, namely that he and J had been wrestling and that any intimate touching was inadvertent. Ms. Cohen also testified regarding the appellant's sexual history and marital problems. During recross-examination, the trial defense counsel questioned Ms. Cohen about the family reunification plan:

Q: Okay. Now, CPS required him, you know, or was working on the reunification plan, right? You guys were working together, right? You said that earlier.

A: We don't—right. But we don't set the plan.

Q: Right.

A: The Juvenile Court does.

Q: But you sent—and the Juvenile Court required him to go to some sort of therapy; isn't that right?

A: Right. And we were willing to pay for it.

Record at 724. This was the first reference to juvenile court or any other judicial proceedings before the members.

During subsequent recross-examination, the trial defense counsel pursued the issue further:

Q: Now, ma'am, everyone who goes to these programs is presumed to have done these acts; isn't that right?

A: Yes.

Q: Okay. And they're treated because, you now [sic], they're child molesters, right?

A: Right.

Q: Okay. And if they don't say they're child molesters, they can't be treated; isn't that right?

A: That's right.

*Id.* at 725. The trial counsel followed in subsequent redirect-examination:

Q: Accused has committed these acts?

A: [Witness pauses.]

Q: I mean, is it just the victim or [sic] there something else out there?

A: There's—there's often a true finding by the Juvenile Court.

DC: Objection.

*Id.* at 726. The military judge sustained the objection based on lack of relevance. *Id.* at 726–27.

We conclude that the trial defense counsel first elicited evidence of possible prior adjudication of J's allegations by a juvenile court. When the trial counsel tried to follow up on the trial defense counsel's line of questioning and elicited testimony of a "true finding" by

another court, the military judge sustained the objection. The military judge had previously given the standard instruction to the members that they were to disregard any testimony to which the military judge had sustained an objection. *Id.* at 561. We presume that the members comply with instructions from the military judge. *United States v. Jenkins*, 54 M.J. 12, 20 (2000). Based on the foregoing facts, we conclude that the military judge committed no error, much less plain error.

The appellant next refers to the testimony of Mr. Martin, a witness called by the defense during its case-in-chief. Mr. Martin testified about the group therapy sessions generally. The trial defense counsel questioned the witness about the process by which the appellant and other participants were placed in group therapy. During direct examination, the following colloquy ensued:

Q: What do they do to get there?

A: Right.

Q: That's what I'm asking.

A: All right. They—if I understand your question correctly, they have been referred to us by Child Protective Services because of a Child Protective Services' investigation; they believe that the person has been an offender. Sometimes the case has already been adjudicated in criminal court or what have you.

. . . .

Q: Now, Mr. Martin, you said earlier that these people had already had court cases. What are you saying? Where did these they come from in the system?

A: Well, some have had court cases.

Q: What does that mean?

A: They have—oftentimes the—there will be criminal charges, as well as—there's sort of two systems going in parallel, CPS and a criminal case, as well; sometimes two criminal cases, one in adult court and one in juvenile court.

Q: So are there convicts in there, sir?

A: As I said earlier, men from all walks of life.

Q: Okay. Is that a "yes"?

A: Yes, uh-huh.

Record at 828–30. After the trial defense counsel opened this evidentiary door with Mr. Martin, the trial counsel walked through it:

Q: Mr. Martin, these—these individuals that come to SAFE Paths, they're—they're there for a reason, aren't they?

A: Yes, they are.

Q: These aren't just people that have had—that there is an inkling that they may be involved in sexual molestation; is that correct?

A: I'm not sure that I understand your question, as stated.

Q: Well, there's a process that they have to go through before ever getting to you; isn't that right?

A: That is correct.

Q: And so by the time that they get to you, generally you're confident that they are, in fact, sexual molesters?

A: I would have to say fairly confident, yeah.

*Id.* at 841. There was no objection to the foregoing questions. In the context of the obvious strategy of the defense counsel to show that the appellant made admissions to Mr. Martin and others solely to reunify with his family, we conclude that the military judge did not err in allowing the defense to elicit facts in support of that strategy. The trial counsel's cross-examination did not elicit any reference to a prior adjudication by another court, it merely elicited an opinion by the witness. Had the trial defense counsel not pursued this general line of questioning initially, we have no reason to believe that any reference to a juvenile court would have been made before the members. This assignment of error is without merit.

### Government's Investigation and Due Process

■ The appellant argues that the actions of his command, the Family Advocacy Program and CPS "created a scenario where Appellant was faced with the unconscionable Hobson's Choice of falsely admitting to sexually molesting the complaining witness or run the risk of not seeing his children again." Appellant's Brief of 18 Jul 2002 at 11. The

appellant further contends that to use the admissions obtained under such circumstances, both as the basis of charges against him and as the primary evidence against him at trial, "shocks the conscience" and offends the most basic notions of due process. *Id.* We disagree.

The actions cited in the appellant's brief were: (1) the issuance of the order restraining the appellant from seeing his children immediately following J's report of the appellant's offenses; (2) the adoption of a requirement that the appellant could not be reunited with his children unless he completed mandatory counseling sessions; and (3) the adoption of a requirement that he admit guilt in order to complete the mandatory counseling sessions. *Id.* at 12–13.

It is well-settled that the Due Process clause of the Fifth Amendment to the U.S. Constitution "prevents the government from engaging in conduct that 'shocks the conscience.'" *United States v. Salerno,* 481 U.S. 739, 746, 107 S.Ct. 2095, 95 L.Ed.2d 697 (1987); *accord Rochin v. California,* 342 U.S. 165, 172–73, 72 S.Ct. 205, 96 L.Ed. 183 (1952). In the factual context of this alleged violation of due process, the leading case in military jurisprudence is *United States v. Ellis,* 57 M.J. 375 (2002). In *Ellis,* a case involving involuntary manslaughter of the appellant's small child, one of two issues before our superior Court was whether the appellant's confession was voluntary. When first questioned about the child's death, the appellant first denied any culpability. The appellant's confession was obtained later by civilian police after he and his wife were advised that: (1) both could be arrested for child abuse; and (2) if both were arrested, their six other children would probably be removed from their home and placed in foster care. After hearing this, the appellant's wife spoke to the appellant for about 15 minutes. The appellant then confessed to the police.

In discussing whether Petty Officer Ellis' confession was voluntary, the Court noted that, "[I]n [a] family context, we can imagine circumstances involving threats, promises, or other inducements that would raise questions of the voluntariness of an accused's statements...." *Id.* at 378–79 (quoting *United States v. Moreno,* 36 M.J. 107, 112 (C.M.A. 1992)). Significantly, the Court then observed that merely advising the appellant of the practical consequences of arrest, i.e., placement of the children in foster care does not transform an otherwise voluntary confession into an involuntary confession. After considering all of the facts and circumstances, including the appellant's age, education, relative intelligence, his physical and psychological character, the absence of threats or physical abuse, the length of the interrogation and the intervention of the appellant's wife of her own accord, the Court concluded that the confession was voluntary.

As we consider the *Ellis* case in our appraisal of the facts in this case, we first note that there is a paucity of evidence that the Naval or civilian authorities worked together to create a coercive environment inducing the appellant to make a confession. While the appellant contends that his command, the Family Advocacy Program and CPS "created a [coercive] scenario," and suggests that concerted actions by these bodies placed a Hobson's Choice before him, we perceive that the cognizant officials simply tried to do what they were supposed to do in assisting J and her family. We find the following facts to be significant in our analysis:

1. At the time of the initial report of sexual abuse, the appellant was a 35–year–old petty officer with over 16 years of active duty service.

2. The appellant indicated he wanted to talk to NCIS and reported to the NCIS office voluntarily.

3. During the NCIS interrogation, the agents did not mention his children, CPS or Family Advocacy, nor were the agents even aware of any family reunification plan or the requirements of such a plan.

4. The appellant confessed to NCIS only after having been duly advised of his rights and waiving those rights in writing.

5. The agents did not threaten him or use physical force during the interrogation. While Special Agent Thomas may have raised his voice and thumped a desk in telling the appellant that his wrestling story was incredible, we do not believe that such con-

duct, if it occurred, played a significant role in the appellant's decision to confess to his misconduct.

6. The duration of, and physical setting for, the NCIS interrogation was not oppressive.

7. As the appellant broke down and confessed, he cried and explained that he felt relieved that he didn't have to lie any more.

8. When the appellant made admissions to Dr. Barnes and Mr. Martin, he volunteered that information in the absence of any interrogation.

9. Neither Dr. Barnes nor Mr. Martin told the appellant that he could not receive any therapy or assistance if he did not confess.

10. The admissions made to Dr. Barnes and Mr. Martin were general and vague.

11. In telling the wrestling story and denying that he had deliberately fondled his daughter, the appellant lied in order to avoid the consequences of his actions. He confessed to NCIS and made admissions to Dr. Barnes and Mr. Martin because he had, in fact, committed the offenses and wanted to rid himself of the extreme guilt he felt.

The appellant has not cited any authority for the proposition that such a factual scenario constitutes a violation of due process. We have carefully considered those cases the appellant has cited, but each is distinguishable on its facts. In this case, nobody warned the appellant that he would lose financial assistance if he did not cooperate, *see Lynumn v. Illinois*, 372 U.S. 528, 534, 83 S.Ct. 917, 9 L.Ed.2d 922 (1963); nobody involuntarily pumped the appellant's stomach, *see Rochin*, 342 U.S. at 173, 72 S.Ct. 205; nobody assaulted the appellant, *see Brown v. Mississippi*, 297 U.S. 278, 285–86, 56 S.Ct. 461, 80 L.Ed. 682 (1936); and nobody threatened the appellant with the loss of his children if he didn't confess, *see United States v. Tingle*, 658 F.2d 1332, 1336 (9th Cir.1981). While the appellant may have been unhappy with the restraining order and the Family Advocacy/CPS reunification plan, these actions of the Government were legitimate expressions of public policies designed to promote the safety and integrity of children and

their families. Based on our review of the entire record, we conclude that the appellant has failed to show any conduct by Naval or state authorities that would "shock the conscience" and violate the appellant's constitutional right to due process.

## Expert Testimony and Argument on Appellant's Credibility

The appellant asserts that the trial counsel committed plain error in: (1) eliciting expert testimony that the appellant lied about wrestling with J; and (2) using that testimony to argue that the appellant's testimony was incredible. We disagree.

During Dr. Barnes' testimony, the following exchange occurred:

Q: . . . did you speak with the accused about the actual allegations in this case of sexual abuse?

A: We—in generalities, not in specifics.

Q: Okay. What, if anything, had he said occurred in the beginning of your counseling sessions?

A: For the first seven sessions, [the appellant] was consistent that the abuse was an accident that probably occurred when he was wrestling with and/or tickling his daughter.

Q: Okay. Had you heard that sort of explanation, you know, the wrestling type incident, have you heard that sort of explanation before?

A: They're called "boundary problems." They're very common explanations why— that people provide as to the reasons for having inappropriate contact with children.

Q: Okay. Did the accused's story about what had happened ever change?

A: Yes.

Record at 1029. There was no objection by trial defense counsel to this testimony. A few minutes later, the military judge instructed the members that only they could determine the facts and the relative credibility of witnesses. After verifying that the members understood that instruction, the military judge specifically advised the members that, "To the extent that the witness indicated he either believed or didn't believe something, you may not consider that as

evidence that a crime actually occurred or that the witness is credible." *Id.* at 1039–40.

That general principle was reiterated in the substantive instructions given to the members after all evidence had been presented but before arguments were made. Specifically, the military judge charged the court: "To the extent you believe that Dr. Barnes testified or implied that he believes a crime occurred, you may not consider this as evidence that a crime occurred or that the alleged victim is credible." *Id.* at 1106. The trial counsel then referred to Dr. Barnes' testimony in his closing argument on findings:

> You've heard a lot about this wrestling incident, members. And, you know, truth be told, the government doesn't really care whether the wrestling incident occurred or not. *I know that what [J] says happened was not a wrestling incident.* But you get a good glimpse, members, into what it is that the accused wants you to believe and what it is that the accused wants [J] to believe at the time in which it happened.
>
> *Firstly, remember, Dr. Barnes says, "Yeah, I speak with these guys all the time; and I've heard this wrestling story over and over again."* Now, think about what the accused wants [J] to think, to perceive at the time in which he's touching her on his bed. He's looking up to her and saying, "Dad's just playing with you. We're just playing, just as if we were tickling each other. This is just play time," very similar to what the accused had maintained throughout this time; and that is, "Yeah, it happened during a wrestling incident."

*Id.* at 1152–53 (emphasis added). There was no objection to this argument or to the instructions of the military judge.

In this case, because the appellant failed to raise a timely objection to Dr. Barnes' testimony at trial, he forfeited the issue absent plain error. *United States v. Robbins,* 52 M.J. 455, 457 (2000). To constitute plain error, the error must be obvious and materially prejudice a substantial right of the appellant. Art. 59(a), UCMJ; *Powell,* 49 M.J. at 461–65.

 It is black-letter law that an expert witness may not offer an opinion as to the credibility of another witness, particularly when the other witness is the alleged victim in a child sexual abuse case. *Robbins,* 52 M.J. at 457; *United States v. Birdsall,* 47 M.J. 404, 410 (1998). Assuming, without deciding, that Dr. Barnes' testimony exceeded the permissible limits of expert testimony, we do not find that the appellant's substantial right to have the members determine the ultimate issues in his case was materially prejudiced.

First, the nature of Dr. Barnes's testimony suggests some doubt as to exactly what he was trying to say and how it might reasonably have been interpreted by the members. He never clearly offered an opinion that the appellant was lying or that J was telling the truth. It is entirely possible that the members may have interpreted his testimony as a simple recounting of what he had been told by many clients without any specific associated connotation of untruthfulness as to the appellant. While it is certainly possible that the members concluded that Dr. Barnes had opined that the appellant was less than truthful in his description of what happened, the actual impact upon the members' deliberation is speculative.

Second, this is not an extremely close evidentiary case, such as the pure "swearing contest" between a child-prosecutrix and an accused, where an expert's improper opinion may easily tip the scales against an accused. *See generally Birdsall,* 47 M.J. at 410; *United States v. Harrison,* 31 M.J. 330, 332 (C.M.A.1990); *United States v. Petersen,* 24 M.J. 283, 284–85 (C.M.A.1987). Rather, the Government presented a strong case consisting of J's testimony, the appellant's NCIS confession, and his admissions to Dr. Barnes and Mr. Martin.

Third, the military judge twice properly instructed the members to disregard Dr. Barnes' testimony to the extent that it was a comment on the credibility of any witness or an opinion that the appellant committed the charged offenses. We think it is significant that the first instruction closely followed Dr. Barnes' testimony, thereby tending to quickly neutralize any advantage for the Govern-

ment. We also think it is significant that the military judge delivered the second instruction *immediately before* the trial counsel made improper argument on Dr. Barnes' testimony. Thus, the members were prepared to discount the trial counsel's argument immediately. In the absence of clear and convincing evidence to the contrary, members are presumed to follow the instructions of the military judge. *Jenkins,* 54 M.J. at 20 (citing *United States v. Garrett,* 24 M.J. 413, 418 (C.M.A.1987)). We see nothing in the record to indicate that the members of this court-martial failed to do so.

We now focus on the trial counsel's argument. The appellant first asserts that the trial counsel committed plain error by relying on Dr. Barnes' testimony in his closing argument. For the reasons stated above, particularly the absence of any objection to the argument, we conclude that there was no plain error in the trial counsel's reference to this testimony.

■ The appellant next contends that the trial counsel impermissibly stated his personal opinion of the evidence during the same closing argument. The Government contends that the sentence: "*I know* that what [J] says happened was not a wrestling incident" was nothing more than reasonable comment on the evidence. We disagree. The trial counsel's use of the singular personal pronoun "I", coupled with the strong declaration "know", impermissibly asserted his personal belief as to the relative credibility of J and the appellant. Consistent with the Navy's Rules of Professional Conduct [6], our superior Court has held that it is improper for a prosecutor to state his or her personal belief regarding the credibility of a witness. *United States v. Horn,* 9 M.J. 429, 430 (C.M.A.1980).

However, while we do not condone the argument, we conclude that the appellant suffered no material prejudice by this comment. This was a one-time passing reference made in the course of an argument that occupies 11 pages in the record of trial. Moreover, as stated previously, the Government presented a strong evidentiary case.

Based upon our scrutiny of the record, we are convinced that the trial counsel's momentary lapse during a lengthy argument had no impact upon the members' deliberations.

### Conclusion

We have considered the remaining assignment of error and find it to be without merit. The findings and sentence, as approved on review below, are affirmed.

We note that the court-martial promulgating order fails to reflect the military judge's granting of a motion for a finding of not guilty as to the following language in Charge I, Specification 2: "and by climbing on top of her and rubbing his body on hers." Charge Sheet. Accordingly, we direct that the supplemental court-martial order correct this error.

Judge CARVER and Judge BRYANT concur.

---

**6.** Judge Advocate General Instruction 5803.1B, Rule 3.4(a)(4)(11 Feb 2000).