*This opinion is subject to administrative correction before final disposition.*

# United States Navy–Marine Corps
# Court of Criminal Appeals

Before
DALY, GROSS, and de GROOT
Appellate Military Judges

―――――――――――――

**UNITED STATES**
*Appellee*

**v.**

**Zachary M. PETERS**
Ensign (O-1), U.S. Navy
*Appellant*

**No. 202300238**

―――――――――――――

Decided: 14 March 2025

Appeal from the United States Navy-Marine Corps Trial Judiciary

Military Judges:
Justin C. Henderson (arraignment and motions)
Michelle M. Pettit (motions and trial)

Sentence adjudged 26 May 2023 by a general court-martial tried at Naval Air Station Whidbey Island, Washington, consisting of officer members. Sentence in the Entry of Judgment: confinement for two years and a dismissal.[1]

For Appellant:
*Major Joshua Keefe, USMC*

―――――――――――

[1] Appellant elected to be sentenced by military judge.

For Appellee:
*Major Mary Claire Finnen, USMC* (on brief and argued)
*Lieutenant Commander James P. Wu Zhu, JAGC, USN* (on brief)

Senior Judge DALY delivered the opinion of the Court, in which Judge GROSS and Judge de GROOT joined.

———————————————

**This opinion does not serve as binding precedent, but may be cited as persuasive authority under NMCCA Rule of Appellate Procedure 30.2(b).**

———————————————

DALY, Senior Judge:

Appellant was convicted, contrary to his pleas, of two specifications of false official statement, one specification of abusive sexual contact, and one specification of sexual assault, in violation of Articles 107 and 120, Uniform Code of Military Justice (UCMJ), respectively.[2]

Appellant asserts six assignments of error (AOE). None warrant relief. Three warrant discussion: (1) whether Appellant's statement to NCIS was involuntary; (2) whether the military judge abused his discretion in denying the production of two requested witnesses; and (3) whether the military judge abused her discretion by denying a defense challenge to a member for implied bias.[3] We find no prejudicial error and affirm.

---

[2] 10 U.S.C. §§ 907, 920.

The Court recognizes Mr. Jacob Hoechster for his outstanding work on this case. Mr. Hoechster joined us through the externship program from George Washington University Law School. He had a tremendous, positive impact during his time and we are grateful for his contributions.

[3] Appellant's fourth AOE is whether trial defense counsel were ineffective for failing to seek reconsideration of the military judge's denial of the two previously denied witnesses. After reviewing the filings and the record, Appellant has failed to demonstrate a reasonable probability that reconsideration of the judge's previous ruling would have been meritorious. *Post* p. 9–12. *See United States v. Palik*, 84 M.J. 284, 289 (C.A.A.F. 2024).

Appellant's fifth AOE is whether the evidence supporting his convictions for abusive sexual contact and sexual assault is factually sufficient. We assume Appellant has

## I. BACKGROUND

Appellant and Second Lieutenant (2ndLt) L.E. were classmates attending a course in Milton, Florida. Towards the end of the ten-week course the students had a barbecue where they drank alcohol and played games in the courtyard near their rooms. After the barbecue, Appellant texted 2ndLt L.E.: "I honestly just want to hang out with you as much as I can while I can."[4] Second Lieutenant L.E. responded: "just hang out seriously" and "that's it."[5] Appellant reassured her: "I don't know how many times I have to prove to you I'm not the same as every dude on earth."[6] Second Lieutenant L.E. reminded him that it was 1 a.m. but nonetheless agreed to hang out. Appellant responded: "Are you extremely attractive? Absolutely. Would I love to do all sorts of crazy stuff with you, most definitely. But I'm telling you I like talking to you. I think you are an awesome person."[7]

They briefly messaged about their respective marriages before 2ndLt L.E. told Appellant that she "would hang out with [him] but that's it."[8] Appellant went to 2ndLt L.E.'s room. As the conversation slowed, 2ndLt L.E. set a timer and told Appellant "when this timer on my phone goes off, like it's time for you to leave."[9] But when the timer went off, Appellant did not leave—rather he

---

made an adequate showing to trigger our factual sufficiency review. And, after weighing the evidence and providing appropriate deference, we are convinced that the evidence proves Appellant's guilt beyond a reasonable doubt and we are "clearly convinced of the correctness of this decision." *United States v. Harvey*, __ M.J. __, 2024 CAAF LEXIS 502 at *12–13 (C.A.A.F. September 6, 2024); 10 U.S.C. § 866(d)(1)(B).

Appellant's final AOE is whether he was denied his constitutional right to a unanimous verdict. This AOE is without merit. *See United States v. Anderson*, 83 M.J. 291 (C.A.A.F. 2023).

[4] Pros. Ex. 2.

[5] Pros. Ex. 2.

[6] Pros. Ex. 2.

[7] Pros. Ex. 2.

[8] Pros. Ex. 2 (Appellant indicated that he did not "live with the mother of [his] daughter" but was also "not legally divorced." Second Lieutenant L.E. said that she was married and that it was "tough.").

[9] R. at 713–14.

approached 2ndLt L.E. and got on top of her. Appellant began kissing her. Second Lieutenant L.E. described herself as "frozen."[10] Appellant took off her clothing and started touching her breasts. At this point, 2ndLt L.E. told Appellant to "stop" and "I don't want to do this" and "that's enough."[11] Appellant responded "it's okay" and continued to touch and kiss her.[12]

Appellant then picked up 2ndLt L.E. and carried her to the bed, which was approximately ten feet away.[13] During this transition, 2ndLt L.E. repeatedly told Appellant "stop," "no," "I don't want to have sex with you," and "just please stop. Please stop."[14] While on the bed, Appellant put his penis inside 2ndLt L.E.'s vagina. She told him "[j]ust please don't [ejaculate] inside of me."[15] Appellant eventually ejaculated on the bed. Second Lieutenant L.E. just laid there: "[Appellant] left my room and I just went into like a complete emotional –I started crying. I couldn't stop crying."[16] She immediately called her husband and her mom, but her disrupted emotional state prevented her from articulating exactly what had occurred. She attended the course's final class the following morning and shortly after, 2ndLt L.E. and Appellant transferred to their respective duty stations. Second Lieutenant L.E. initially made a restricted report in October and then an unrestricted report of sexual assault in January of 2022.

The Naval Criminal Investigative Service (NCIS) initiated an investigation following 2ndLt L.E.'s unrestricted report. An NCIS special agent recorded two oral wire intercept calls with Appellant where he denied having sex with 2ndLt L.E.. Two months later, NCIS special agents interviewed Appellant. He was properly advised of his rights in accordance with Article 31(b), UCMJ. He told them that he did not remember the night in question. Despite his lack of memory, Appellant denied sexually assaulting 2ndLt L.E. reasoning that it could not have occurred since he woke up in his bed, alone. He denied going to

---

[10] R. at 715.

[11] R. at 716.

[12] R. at 717.

[13] R. at 718. At the time of the incident, 2ndLt L.E. was five foot four inches tall and weighed approximately 120 pounds. She estimates that Appellant was six feet tall and weighed approximately 180 pounds. *See* R. at 711–12.

[14] R. at 719.

[15] R. at 721. 2ndLt L.E. also attempted to position her hands and move away but felt "stuck and trapped" by Appellant. *See* R. at 717.

[16] R. at 722.

her room on the night in question. And he denied being attracted to her. Appellant told the special agents: "I don't think I ever crossed the line because I had no intention ever being with anyone there."[17]

The special agents confronted Appellant with messages where he explicitly said that he was attracted to 2ndLt L.E., that he "would love to do all crazy stuff" with her, and that he wanted to hang out with her on the evening in question.[18] Appellant maintained his denials and said that he did not remember sending the messages in question. The special agents eventually told Appellant that they were going to write the report, that it was going to be reviewed by the Region Legal Service Office, and ultimately by Appellant's commanding officer.[19] They asked Appellant: "[w]hat is it that you want us to tell your CO?"[20] The special agents reiterated this question multiple times and after some deliberations, and after posing various hypotheticals, Appellant said: "Yeah. So, I guess I'd rather you say that I lied than you tell them I raped somebody because I didn't do that."[21] Appellant said that he remembered the night in question and that his previous statement was false. Appellant then told the special agents that while in the room with 2ndLt L.E.: she asked him to kiss her; she asked him to take off her shirt; she asked him to turn off the alarm; she took her own pants off; she asked him to perform oral sex on her; and she asked him to "stick it in."[22] According to Appellant, the only thing he asked for was a hug after ejaculating.[23]

Additional facts relevant to resolve the assignments of error are included below.

---

[17] App. Ex. Va at 26. Appellant messaged 2ndLt L.E., "I didn't know you were married. I'm sorry if I crossed a line" as well as "Yes, I enjoy your company, but I can't say that I'm not attracted to you. And I would take a chance if you offered it, *which is probably crossing a line*." *Id.* (emphasis added); *see also* Pros. Ex. 2.

[18] App. Ex. Va at 26, 29–32, 42–52.

[19] App. Ex. Va at 58.

[20] App. Ex. Va at 58.

[21] App. Ex. Va at 64.

[22] App. Ex. Va at 65–66.

[23] App. Ex. Va at 65–66.

## II. DISCUSSION

**A. Appellant's statement to NCIS agents was voluntary.**

Prior to trial, Appellant filed a motion to suppress his statement, arguing that the special agents' repeated references to his commanding officer constituted a threat, which rendered his statement involuntary. The military judge denied the motion; Appellant now asks this Court to find that the military judge erred in her decision.[24]

*1. Law*

"We review a military judge's ruling on a motion to suppress for an abuse of discretion and consider the evidence in the light most favorable to the party that prevailed at trial."[25] Military judges abuse their discretion if their findings of fact are clearly erroneous or their conclusions of law are incorrect.[26] The voluntariness of a confession is a question of law reviewed de novo.[27] We examine voluntariness under the totality of the circumstances, which examines: "the condition of the accused, his health, age, education, and intelligence; the character of the detention, including the conditions of the questioning and rights warning; and the manner of the interrogation, including the length of the interrogation and the use of force, threats, promises, or deceptions."[28] This

---

[24] During oral argument, appellate defense counsel conceded that Appellant's statement to NCIS was voluntary until the point where the special agents referenced Appellant's commanding officer. Appellate defense counsel took the position that Appellant's initial denials remained admissible at trial, but his admission that he lied and his version of events on the night in question should have been suppressed.

[25] *United States v. Nelson*, 82 M.J. 251, 255 (C.A.A.F. 2022) (quoting *United States v. Mitchell*, 76 M.J. 413, 417 (C.A.A.F. 2017)).

[26] *Id.* (citing *United States v. Olson*, 74 M.J. 132, 134 (C.A.A.F. 2015)).

[27] *United States v. Ellis*, 57 M.J. 375, 378 (C.A.A.F. 2002) (citing *Arizona v. Fulminante*, 499 U.S. 279, 287 (1992)).

[28] *Id.* at 379.

is a "holistic assessment of human interaction."[29] "[L]ies, threats, or inducements are not determinative" in this analysis.[30] Moreover, threats to conduct lawful investigative activity are not "objectively coercive."[31]

Recently in *United States v. Patterson*, this Court found that the appellant, First Lieutenant (1stLt) Patterson, provided an involuntary statement to NCIS.[32] Our analysis turned on three factors.[33] First, 1stLt Patterson's executive officer instructed him not to "squirrel around [and] just answer [NCIS's] questions" immediately before 1stLt Patterson was escorted by a separate superior officer to the NCIS offices.[34] The second factor was that the special agent provided an inadequate rights advisement.[35] The final factor was that during the interview, the special agent repeatedly referenced reporting to 1stLt Patterson's command.[36] This final factor was only relevant insofar as it "underscored and amplified the coercive effect of [the executive officer's] directive to answer their questions."[37]

---

[29] *Id.* (quoting *United States v. Martinez*, 38 M.J. 82, 87 (CMA 1993).

[30] *United States v. Freeman*, 65 M.J. 451, 455 (C.A.A.F. 2008) (citing *United States v. Mendoza*, 85 F.3d 1347, 1350-51 (8th Cir. 1996) (holding that an investigator's threat of immediate arrest if he did not cooperate did not overbear the accused's will); *Ledbetter v. Edwards*, 35 F.3d 1062, 1069-70 (6th Cir. 1994) (holding that an investigator's use of a series of psychological ploys, including lying about evidence, staging a phony identification, and showing charts and graphs allegedly linking the accused to the crime did not result in an involuntary confession); *Welch v. Butler*, 835 F.2d 92, 95 (5th Cir. 1988) (holding statements resulting from investigator's three-hour prayer session did not make the accused's confession involuntary).

[31] *United States v. Jacobs*, 63 F.4th 1055, 1059 (6th Cir. 2023) (reversing the suppression of a statement finding that the law enforcement officers threat to obtain a search warrant to search the defendant's house was "not by itself impermissible.").

[32] No. 202200262, 2024 CCA LEXIS 130, *16–17 (N-M. Ct. Crim. App. April 4, 2024) (unpublished).

[33] *Id.*

[34] *Id.* at *17–18.

[35] *Id.* at *18 (The special agent misled Appellant by saying he was not accused of any crime, was only being interviewed to obtain information, and that the rights advisement was "just a piece of paper.").

[36] *Id.*

[37] *Id.*

*2. Analysis*

Appellant's statement was voluntary.[38] He is a college-educated officer with over nine years of military experience.[39] The tone throughout the interview was not "overly aggressive" and the interview was not long.[40] Appellant was properly advised of his rights. He was engaging, articulate, and responsive. The special agents largely asked open-ended questions followed by detailed questions for clarification. It was clear that Appellant had a strategy for this interaction—distance himself from 2ndLt L.E., portray himself as heavily intoxicated on the night in question, be consistent with his previous statements made during the pretext phone calls, and give *just* enough facts to suggest that he did not have sex with her.[41] The problem for him was that this portrayal was directly contradicted by other evidence in NCIS's possession. Throughout the course of the interview, the NCIS special agents confronted Appellant with those pieces of evidence. The special agents bluffed about other evidence in their possession.[42]

Relying on our decision in *Patterson*, Appellant's primary contention is that the special agents "threaten[ed] to tell his [commanding officer] all manner of derogatory things about him."[43] However, Appellant's reliance on our decision in *Patterson* is misplaced because none of the external circumstances that

---

[38] We question whether the special agents' references to Appellant's commanding officer in this case would constitute "threats." The term has not been defined in this context, but Black's Law Dictionary defines a threat as a "communicated intent to inflict harm. . . ." *See Threat*, BLACK'S LAW DICTIONARY (8th ed. 2004). However, given that the issue was not fully developed, briefed, or challenged, we leave for another day the question of whether such references constitute threats.

[39] App. Ex. Va at 7, 34–35.

[40] App. Ex. Va; *see also* R. at 166.

[41] App. Ex. Va. 11–55.

[42] The special agents told Appellant that they had DNA evidence, which they did not. *See* App. Ex. Va., *passim*. Nonetheless this is a permissible investigative tactic. *See Freeman*, 65 M.J. at 456.

[43] Appellant's Br. at 61. Appellant argues that this included a statement in the interview where Appellant indicated that he previously had consensual sex that he did not remember.

made such references relevant to 1stLt Patterson were present here.[44] Moreover, throughout the interview, the special agents emphasized their role as investigators: "We're just here to get the facts."[45] While they pressed him on the *obvious* inconsistencies and falsehoods in his statement, they continuously emphasized that they wanted "the truth."[46] When referencing Appellant's commanding officer, the special agents summarized what the report was going to say and then they asked Appellant what he wanted to add.[47] This left the decision to change his statement with Appellant.

Ultimately, Appellant made the independent decision to change his story and he told the special agents that he engaged in sexual intercourse with 2ndLt L.E. *at her request.* We agree with the assessment of the military judge. Appellant understood that the investigation was going up "the chain of command" and he made a "calculated" decision, "thinking through what [was] the best thing for him."[48] We reiterate that referring to an accused's chain of command during an interview is not "per se improper."[49] Looking at the totality of the circumstances, we hold that Appellant's statement was voluntary.

## B. The military judge did not abuse his discretion in denying the production of First Lieutenant Sierra and First Lieutenant Gatsby.[50]

Prior to trial, Appellant requested the Government produce First Lieutenant (1stLt) Sierra and 1stLt Gatsby. Appellant argued that 1stLt Sierra was relevant and necessary to undermine 2ndLt L.E.'s credibility because he would testify that, during an unofficial trip to a casino in Biloxi, Mississippi (several days before the incident), he typed "don't come" on 2ndLt L.E.'s phone in response to Appellant's messages. Appellant's theory was that 1stLt Sierra's testimony would directly contradict 2ndLt L.E.'s previous statement to law enforcement that 1stLt Sierra and the other Marine present were messaging Appellant from her phone. According to trial defense counsel, this would also show that 1stLt Sierra did not want Appellant to join the group. Appellant argued that 1stLt Gatsby was relevant and necessary to testify that he knew 2ndLt

---

[44] 2024 CCA LEXIS at *16–17.

[45] App. Ex. Va. at 62.

[46] App. Ex. Va at 58.

[47] App. Ex. Va at 58–62.

[48] R. at 176.

[49] *Patterson,* 2024 CCA LEXIS at *18, n. 87.

[50] All names in this opinion, other than those of Appellant, the Victim, the judges, and counsel, are pseudonyms.

L.E. and that he did not notice anything out of the ordinary in her behavior or appearance the day following the alleged sexual assault.

The military judge issued a written ruling, wherein he found:

> As to 1stLt [Sierra] and 1stLt [Gatsby], the Defense has failed to carry its burden to show necessity. The testimony of 1stLt [Sierra] could possibly undercut a prior statement by [2ndLt L.E.] to law enforcement . . . but such proffered impeachment-by-contradiction is not direct, it concerns a collateral matter, and the text messages between [Appellant] and [2ndLt] L.E. largely speak for themselves. Because his testimony is not important to the consequential facts in the case, and given the likelihood of confusing the material issues through his testimony about who really wanted or did not want [Appellant] to come to a *different* event, two or three days before the charged acts, 1stLt [Sierra] is not a necessary witness. Nor is 1stLt [Gatsby], for much more straightforward reasons: his opinion of how [2ndLt L.E.] presented in the classroom in the days following the charged acts . . . simply does not matter.[51]

*1. Law*

An accused has an "equal opportunity to obtain witnesses and other evidence."[52] A party is entitled to "production of witnesses whose testimony would be relevant and necessary to a matter in issue."[53] Factors to be weighed to determine whether personal production of a witness is necessary include: the issues involved in the case and the importance of those issues; whether the witness is requested to testify on the merits or in sentencing; whether the expected testimony would be cumulative; and whether available alternatives to the personal appearance of the witness exist, such as depositions, interrogatories, or previous testimony.[54]

We review the military judge's decision for an abuse of discretion.[55] Military judges abuse their discretion (1) if the findings of fact upon which they

---

[51] App. Ex. XXXVI at 5 (emphasis in original).

[52] 10 U.S.C. § 846.

[53] *United States v. Breeding*, 44 M.J. 345, 350 (C.A.A.F. 1996) (citing Rule for Courts-Martial 703(b)(1)) (internal quotations omitted).

[54] *United States v. McElhaney*, 54 M.J. 120, 127 (C.A.A.F. 2000) (citations omitted).

[55] *United States v. Wilson*, 84 M.J. 383, 390–91 (C.A.A.F. 2024) (citation omitted).

predicate their ruling are not supported by the evidence of record; (2) if they use incorrect legal principles; or, (3) if their application of the correct legal principles to the facts is clearly unreasonable.[56] "[T]he abuse of discretion standard of review recognizes that a judge has a wide range of choices and will not be reversed so long as the decision remains within that range."[57]

*2. Analysis*

Appellant argues that the military judge erred in denying his request for 1stLt Sierra for two reasons: (1) his proffered testimony would have demonstrated that 2ndLt L.E. invited Appellant to the casino in Biloxi despite 1stLt Sierra's concerns and (2) 2ndLt L.E. was not truthful in her "testimony suggesting that at least some of the responses to [Appellant's] messages from her phone had been from her friends and not her."[58] However, Appellant has failed to demonstrate any material contradiction between 2ndLt L.E.'s testimony and 1stLt Sierra's proffered testimony. As to Appellant's first reason, 2ndLt L.E. testified that she did not "recall" 1stLt Sierra telling her not to invite Appellant but she otherwise agreed that he was "uncomfortable" with the situation.[59] As to Appellant's second reason, 1stLt Sierra's proffered testimony that he typed a message on 2ndLt L.E.'s phone tends to support 2ndLt L.E.'s testimony that the other members of the group participated in the review and formulation of the messages in question—particularly when one of the messages appeared to be signed by the third member of the group, 1stLt Golf, who testified at trial.[60] After reviewing the evidence presented, 1stLt Sierra's proffered testimony was too attenuated, risked confusing the issues, and did not provide a clear contradiction of 2ndLt L.E.'s testimony. Accordingly, the military judge was well within his discretion to deny Appellant's request for production.

Similarly, Appellant argues that the military judge erred in denying his request for 1stLt Gatsby because "he would have testified that [2ndLt L.E.] did not appear upset or distraught the day after the alleged assault [and] such

---

[56] *Id.*

[57] *United States v. Ellis*, 68 M.J. 341, 344 (C.A.A.F. 2010).

[58] Appellant's Brief at 22.

[59] R. at 743.

[60] R. at 665. One of the messages appeared to be signed by 1stLt Golf. *See* Pros. Ex. 2. Second Lieutenant L.E. testified that the message was sent by 1stLt Golf. *See* R. at 692. First Lieutenant Golf testified that she did not remember sending the message because it "was just a totally insignificant thing that I don't remember at all. . . ." R. at 665.

11

evidence would support the defense['s] theory" that this was a consensual sexual encounter.[61] However, the evidence presented to the military judge concerning 1stLt Gatsby's observations and familiarity with 2ndLt L.E. was not clear. Trial defense counsel attached an email as evidence that 1stLt Gatsby did "not recall that [2ndLt L.E.] had any abnormal demeanor the following day."[62] In response, the Government produced notes from its interview with 1stLt Gatsby where he said that 2ndLt L.E. did not sit near him, "didn't really speak" to him the following day, and they were "not close" enough to share information about the sexual assault.[63] While the Government presented some evidence at trial that 2ndLt L.E. was distraught the following day, it is not clear that this was during class or otherwise in the presence of 1stLt Gatsby. There may be situations where a witness of this type is relevant and necessary; however, the military judge was within his discretion to deny Appellant's motion to produce 1stLt Gatsby particularly due to the conflicting evidence relating to 1stLt Gatsby's knowledge and observations.

## C. The military judge did not abuse her discretion in denying defense's challenge for implied bias of Lieutenant Junior Grade Tango.

At trial, Appellant challenged Lieutenant Junior Grade (LTJG) Tango for implied bias on the basis that three of his friends previously disclosed their experience as victims of sexual assault.[64]

During individual voir dire, LTJG Tango recounted that a close friend from high school recently told him that she had been sexually assaulted several years earlier while she was in high school. Lieutenant Junior Grade Tango also disclosed that he was in a college organization where two female members disclosed that they had been victims of sexual assault. Lieutenant Junior Grade Tango was in weekly contact with his friend from high school, but was less connected to his friends from the college organization.

---

[61] Appellant's Brief at 28. We note that although 1stLt Sierra was requested to testify concerning the messages relating to Biloxi, he told trial defense counsel that 2ndLt L.E. was "more reserved" after the incident and that she appeared "upset" as if "she had been crying." *See* App. Ex. XIVa, Encl. C., at 2.

[62] Encl. D of App. Ex. XIV.

[63] App. Ex. XVa.

[64] R. at 599–600. Appellant also challenged LTJG Tango on another basis, but that basis was not raised pursuant to Appellant's AOE.

In response to questioning by counsel and the military judge, LTJG Tango said that he initially thought of his friend when he first read the charge sheet, but that these initial thoughts did not cause an emotional response.[65] He was confident that he "would be able to put [his friend's experience] aside and render an impartial judgement."[66] When asked if he would be able to follow the military judge's instructions, LTJG Tango was unequivocal: "[a]bsolutely."[67] And when the military judge asked him if he had any "concerns" that his friends' experiences would "in any way color the way in which [he] view[ed] the evidence in this case," he was again unequivocal: "[n]o, Your Honor."[68]

The military judge denied Appellant's challenge of LTJG Tango for implied bias. She provided numerous reasons in support of her decision, to include: LTJG Tango was "strong" about being able to look at the facts of this case and follow the military judge's instructions; he did not have any emotional responses in discussing his friends' experiences; he was not close with his college friends; and the experience with his high school friend was "a very different scenario."[69]

*1. Law*

We review a military judge's implied bias analysis under a standard of review that is less deferential than abuse of discretion, but more deferential than de novo.[70] The more reasoning a military judge provides, the more deference he or she will receive.[71]

The test for implied bias considers the public's perception of fairness.[72] Here the question is whether LTJG Tango's service on the panel calls into question the public's perception of the fairness and impartiality of the court-martial. We look to the totality of the circumstances in conducting our review and we "assume the public is familiar with the unique structure of the military

---

[65] R. at 512.

[66] R. at 502.

[67] R. at 502.

[68] R. at 512. The military judge asked again if he would be able to put those instances aside and Appellant was *again* unequivocal: "Absolutely. Yes, Your Honor."

[69] R. at 602–05.

[70] *United States v. Keago*, 84 M.J. 367, 373 (C.A.A.F. 2024) (citation omitted).

[71] *Id.* (citing *United States v. Rogers*, 75 M.J. 270, 273 (C.A.A.F. 2016)).

[72] *United States v. Woods*, 74 M.J. 238, 243 (C.A.A.F. 2015) (citations omitted).

justice system."[73] There is no per se rule that bars individuals from serving as potential members based on their prior experience, so long as there are sufficient facts do demonstrate that they would be able to render an impartial verdict and follow the military judge's instructions.[74]

*2. Analysis*

The military judge did not err in denying Appellant's challenge to LTJG Tango for implied bias.[75] He was open and forthright about his friends' experiences and their impact on him. He gave thoughtful and precise answers and avoided making "broad characterization[s]."[76] He was consistent and clear about his ability to follow the military judge's instructions. Lieutenant Junior Grade Tango was equally clear that he was able to separate his friend's experiences and his personal feelings from the evidence introduced at trial. And he clearly understood the importance of his role and the process. Further, the military judge provided sufficient justification for her decision.

Appellant argues that the military judge based her ruling on an erroneous view of the law and clearly erroneous facts because the military judge referenced research on implied bias that was not developed in the record and improperly attributed bias training to LTJG Tango.[77] In response to questioning by trial defense counsel, LTJG Tango said, "I think we all have biases. . . whether we recognize them or not. I think that I'm a fairly impartial person and I am able to set those aside, especially when it comes to the letter of law."[78] The military judge followed up and asked if LTJG Tango was aware of research

---

[73] *Id.*

[74] *See Swisher,* 2023 CCA LEXIS 339, *22 (N-M. Ct. Crim. App. August 16, 2023) *reversed on other grounds* __ M.J. __, 2024 CAAF LEXIS 395 (C.A.A.F. July 11, 2024). *See also United States v. Spicer*, 2010 CCA LEXIS 397, *14 (N-M. Ct. Crim. App. 2010) (Member's ex-girlfriend was the victim of a sexual assault in a sexual assault case and the member stated he was "angry" that she was sexually assaulted. Court held that there was insufficient grounds for actual or implied bias to excuse the member); *Cf United States v. Pyron*, 81 M.J. 637 (N-M. Ct. Crim. App. 2021).

[75] We provided the military judge deference in her ruling given that she provided lengthy analysis at two points in the record. However, even if we evaluated this issue de novo (assuming that the military judge improperly considered bias research and that she improperly attributed it to LTJG Tango), we would still hold that the military judge did not err.

[76] R. at 509.

[77] Appellant's Brief at 55.

[78] R. at 509.

that showed that if individuals recognize their bias, they are able to confront it and "move forward without having that bias" be a consideration; LTJG Tango was "not aware of that research" but "would agree with that statement."[79] In the military judge's view, LTJG Tango's understanding of biases would make him more likely to set aside any potential biases and follow her instructions. This was not improper and it was a fraction of the military judge's analysis. By focusing on this discussion of bias, Appellant ignores the multitude of other reasons that the military judge provided to support her ruling, all of which are supported by the record.[80]

We agree with the military judge that no member of the public, having knowledge of the facts and the military justice system, would question the fairness of Appellant's trial based on LTJG Tango's service as a panel member.

## III. CONCLUSION

After careful consideration of the record and briefs of appellate counsel, we have determined that the findings and sentence are correct in law and fact and that no error materially prejudicial to Appellant's substantial rights occurred.[81]

The findings and sentence are **AFFIRMED**.

FOR THE COURT:

MARK K. JAMISON
Clerk of Court

---

[79] R. at 511.

[80] R. at 602–05, 622–628.

[81] Articles 59 & 66, UCMJ, 10 U.S.C. §§ 859, 866.