Chief Judge CRAWFORD
delivered the judgment of the Court.
Appellant was charged with assaulting his two-and-a-half-year-old son, Timothy Ellis, Jr. (Timmy), on June 2, 1994, and on June 3, 1994. He was also charged with murdering Timmy on June 4, 1994. Contrary to his pleas, appellant was convicted by officer and enlisted members of involuntary manslaughter and assault upon a child, in violation of Articles 119 and 128, Uniform Code of Military Justice (UCMJ), 10 USC §§ 919 and 928. The convening authority approved the sentence of a bad-conduct discharge, six years’ confinement, total forfeitures, and reduction to the lowest enlisted grade. The Court of Criminal Appeals affirmed the findings and sentence in an opinion that chronicles the facts and evidence. 54 MJ 958 (2001). We granted review of the following issues:
I. WHETHER THE MILITARY JUDGE ERRED IN FAILING TO SUPPRESS APPELLANT’S INVOLUNTARY CONFESSION.
II. WHETHER THE MILITARY JUDGE ERRED IN FAILING TO DISMISS THE CHARGES OR TO ORDER OTHER APPROPRIATE RELIEF BASED ON THE GOVERNMENT’S DESTRUCTION OF KEY EVIDENCE.
We hold that the military judge did not err in failing to suppress the confession, and that any error in failing to take appropriate action because of the destruction of evidence was harmless beyond a reasonable doubt.[1]
BACKGROUND
Two-and-a-half-year-old Timmy was one of seven children in the home of appellant and his wife. At the time of his death, Timmy weighed 38 pounds and was 35 inches in length. In April, 1994, one month after appellant gained custody over Timmy and his four-year-old sister Teresa from appellant’s ex-wife (and mother of the children), he called Ms. Carmen L. Colon, a case manager for the Family Advocacy Program at the Naval Air Station, Jacksonville, Florida. Appellant told Ms. Colon that he was having problems coping with Timmy’s and Teresa’s impact on the family and indicated he wanted to return them to the custody of the state rather than to his ex-wife. As appellant was *377 undergoing family counseling, no decision was made on his request to return Timmy to the state for care.
On June 4, 1994, appellant’s wife brought Timmy, who was unconscious, to the Naval Hospital in Jacksonville. He was then transferred to the University of Florida Medical Center (Medical Center), where he died four days later.
On June 8, Mr. Louis N. Eliopulos, the Chief Investigator and Operations Manager for District Four, Medical Examiner’s Office, Jacksonville, was informed of Timmy’s death by someone associated with organ retrieval at the Medical Center. Mr. Eliopulos called Detective Anthony Hickson of the Jacksonville Sheriffs Office, Homicide Division, that same day to inform him of Timmy’s death. Prior to Mr. Eliopulos’s telephone call, Detective Hickson knew nothing about Timmy’s death. At the time of this initial telephone call, there was no suspicion of homicide—Mr. Eliopulos called Detective Hickson because it was a case for donor organs. After Mr. Eliopulos’s telephone call was received, Detective Hickson read a report from Mr. Ishmael Woods, a Human Resources Services (HRS) caseworker. Mr. Woods was the official child abuse investigator for HRS on this case. Detective Hickson remembered Mr. Woods’s report reflecting the opinion of a doctor that this was not a child abuse case.
On June 9, Dr. Margarita Arruza, an Associate Medical Examiner for Jacksonville, conducted an autopsy on Timmy. Dr. Arruza determined that the cause of death was blunt trauma to the head. Detective Hickson talked to either Mr. Eliopulos or Dr. Arruza on June 9 after the autopsy. After that conversation, Detective Hickson suspected that Timmy’s death was due to “child abuse homicide.”
On June 10, when appellant and his wife voluntarily arrived at the Jacksonville Sheriffs Office, Detective Hickson certainly suspected a case of child abuse homicide, but he had conflicting reports concerning the possible causes of Timmy’s death. Appellant and his wife were met by Mr. Eliopulos and Detective Hickson. Mr. Eliopulos was present pursuant to normal operating procedures when one of the caregivers discovers an injured child. He had no substantial role in the interrogation and was present to gather medical, social, and family history information from appellant and his wife.
After gathering information and listening to the initial questioning of appellant and Mrs. Ellis, Mr. Eliopulos called his office to determine whether the victim’s injuries could have been caused by the victim accidentally striking his head on a desk as Mrs. Ellis intimated. After determining that such a striking lacked sufficient force to cause the injuries observed at the autopsy, Mr. Eliopulos informed Sergeant Frank Japour and Detective Hickson that he believed a formal interrogation of both family members was appropriate and left the office.
Based upon the initial interviews, Detective Hickson concluded that the victim had been in the sole care of appellant and his wife before he was brought to the hospital. He also concluded that neither appellant nor his wife had provided a satisfactory explanation for the son’s injury. However, neither was arrested. At that point, Detective Hickson decided to proceed with separate accusatory interviews. Appellant and his wife, who separately were provided with Miranda warnings, each waived the privilege against self-incrimination, as well as the right to consult with counsel. 54 MJ at 960.
As described by the Court of Criminal Appeals, Detective Hickson, in the separate interrogations of appellant and his wife, first “informed each of them that he believed there was probable cause to arrest both of them for child abuse.” Id. Next, he “indicated that, if both of them were arrested, their other six children would probably be removed from their home by officials from the Department of Human and Rehabilitative Services [HRS] and temporarily placed in foster care.” Id.
Both appellant and his wife denied any pertinent knowledge. Appellant’s wife, who was interviewed first, also asked to speak to appellant. That request, which was denied initially, was granted after his interrogation in the hopes that it would lead to further information. After meeting with his wife for *378 about 15 minutes, appellant indicated that he wanted to talk.
After appellant had waived his rights in writing, Detective Michael Robinson and Sergeant Japour made an audio tape of appellant’s statement under oath. He confirmed being advised of his rights and his willingness to speak with them without a lawyer. Appellant indicated Timmy was the hardest child to deal with, and Teresa, the four-year-old who looked like a two-year-old, was just a little bit better. Both Teresa and Timmy were his children by his first wife. After she stopped taking birth control pills, she became pregnant so appellant would not ask for a divorce. He admitted Timmy “wasn’t brought into this world under the best of conditions, [but] I still loved him.” When Timmy and Teresa moved in during March 1994, they turned the household upside down. Appellant admitted that he would have liked to place them in a foster home because he could not take care of them.
On Friday, June 2, appellant was watching the children while his wife was with Teresa at a family counseling session. When he went into the bedroom, he noticed that Timmy had “pooped in his pants.” Appellant took him into the bathroom, and the feces fell out of his underwear and onto the floor. Appellant asked Timmy to pick it up. He did not. He just “pushed it around the floor a little bit.” Appellant became angry and again told him to pick it up. Timmy did, but dropped the feces. Finally, Timmy put it in the toilet, at which time appellant, who stood 6 feet 2 inches tall and weighed 230 pounds, hit Timmy on the left side of the face, knocking him into a wall. He pulled him up and dragged him by his feet towards him and started beating him by pounding the back of his head three or four times against the floor. Timmy did not lose consciousness. Later in the day, he was thought to have had a couple of seizures.
On Sunday, June 4, they were having a hard time getting Timmy, who was in the garage, to eat. Mrs. Ellis told appellant she could not handle Timmy any longer. Appellant went into the garage and closed the door. Angry, he picked Timmy up, placed him on the picnic table, and then hit him so hard he knocked him off the table. He fell off the table and hit his head on the concrete floor. Appellant again grabbed Timmy and, three or four times, hit his head on the concrete floor. Shortly thereafter, Timmy became unconscious and he was taken to the emergency room.
Five days earlier, while Timmy was showering, he hit his head, resulting in a trip to the hospital for stitches. Appellant admitted Timmy was self-abusive. As a result, they had to tape his feet and hands to control him. To do the taping, the doctor showed him a trick with a pillowcase and a sheet so they could restrain him to place the tape on him.
DISCUSSION

Confession

The Fifth Amendment provides that “[n]o person ... shall be compelled in any criminal case to be a witness against himself nor be deprived of life, liberty, or property without due process of law----” Congress has implemented this constitutional mandate in Article 31(d), UCMJ, 10 USC § 831(d), which prohibits the admission of any statement into evidence that is “obtained ... through the use of coercion, unlawful influence, or unlawful inducement____” Consequently, an accused’s confession must be voluntary to be admissible into evidence. Dickerson v. United States, 530 U.S. 428, 433, 120 S.Ct. 2326, 147 L.Ed.2d 405 (2000).
The voluntariness of a confession is a question of law which we review de novo. See Arizona v. Fulminante, 499 U.S. 279, 287, 111 S.Ct. 1246, 113 L.Ed.2d 302 (1991). Whether the confession is voluntary requires examining the “totality of all the surrounding circumstances—both the characteristics of the accused and the details of the interrogation.” Schneckloth v. Bustamonte, 412 U.S. 218, 226, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973); United States v. Ford, 51 MJ 445, 451 (1999). “[I]n [a] family context, we can imagine circumstances involving threats, promises, or other inducements that would raise questions of the voluntariness of an accused’s statements____ " *379 United States v. Moreno, 36 MJ 107, 112 (CMA 1992).
Moreno was questioned by the Texas Department of Human Services regarding allegations of child sexual abuse and was faced with a choice of cooperating and possibly keeping custody of his children, or not cooperating and increasing the risks that his children would be taken away. Id. at 109, 112. The Court noted that this dilemma was of his own making. Id. Additionally, there was no improper threat; rather appellant was “merely apprised ... where he stood in the great flow of things.” Id.
In examining the totality of circumstances, we do not look at “cold and sterile list[s] of isolated facts; rather, [we] anticipate[] a holistic assessment of human interaction.” United States v. Martinez, 38 MJ 82, 87 (CMA 1993). The totality of the circumstances include the condition of the accused, his health, age, education, and intelligence; the character of the detention, including the conditions of the questioning and rights warning; and the manner of the interrogation, including the length of the interrogation and the use of force, threats, promises, or deceptions.
Appellant was a 27-year-old Petty Officer Second Class (E-5) with nine years of active duty service, a high-s”chool diploma, and an AFQT score that placed him in the “upper mental group” of Navy classifications. There was no evidence appellant suffered from any psychological handicaps that affected his decision-making ability. We examine the soundness of appellant’s physical and psychological character at the time of interrogation to determine whether the statements were voluntary.
While the detectives’ advice to appellant concerning removing the remaining children from the home may have contributed to his confession, the mere existence of a causal connection does not transform appellant’s otherwise voluntary confession into an involuntary one. See Colorado v. Connelly, 479 U.S. 157, 164 n. 2, 107 S.Ct. 515, 93 L.Ed.2d 473 (1986). While this consequence of appellant’s criminal conduct was unpleasant, the law enforcement officers’ advice was an accurate picture of what would happen in similar cases.
Not only must we examine the circumstances surrounding the taking of the statement regarding what was done or said, but we must also examine what was not done or not said. There were no threats or physical abuse. See, e.g., Payne v. Arkansas, 356 U.S. 560, 566, 78 S.Ct. 844, 2 L.Ed.2d 975 (1958). Thé questioning did not continue for days; there was no incommunicado detention, and no isolation for a prolonged period of time.
Additionally, the detectives did not use appellant’s wife as a government tool to induce him to confess. See, e.g., United States v. Borodzik, 21 USCMA 95, 97, 44 CMR 149, 151 (1971). Initially, the detectives had no idea which spouse may have caused Timmy’s injury. Accordingly, they spoke to both privately. Mrs. Ellis then talked to appellant. After this conversation, appellant confessed.
Viewing all the facts taken together, we agree with the Court of Criminal Appeals that they were not “so inherently coercive as to overcome the appellant’s will to resist.” 54 MJ at 968.

Due Process and Destruction of Evidence

On June 9, Dr. Arruza performed an autopsy and concluded that death was caused by non-accidental blunt trauma to the head on June 4. In addition to the 9.5 centimeter fracture in the skull, there were injuries around both eyes, the right check, the left jaw, and the upper neck. There was a cut on the lip. There was bodily injury on the left side of the chest, the lower left hip, on the back, the right forearm, the right and left knees, and right and left lower legs.
Following the autopsy, Dr. Arruza arranged for storage of the brain and its meninges pursuant to a laboratory regulation providing for specimens to be maintained for at least one year. Several months later, however, the specimen container was inadvertently discarded when the laboratory was moved to a new location. See 54 MJ at 969.
*380 At trial, appellant moved to dismiss the charges, citing RCM 703(f)(2), Manual for Courts-Martial, United States (2000 ed.),[2] which provides in pertinent part with respect to evidence that has been destroyed or lost:
[A] party is not entitled to the production of evidence which is destroyed, lost, or otherwise not subject to compulsory process. However, if such evidence is of such central importance to an issue that it is essential to a fair trial, and, if there is no adequate substitute for such evidence, the military judge shall grant a continuance or other relief....
(Emphasis added.) Appellant also relied upon the right to present a defense under the Fifth Amendment, the right to cross-examine witnesses under the Sixth Amendment, and the right to obtain witnesses under Article 46, UCMJ, 10 USC § 846. Id.
Appellant contended that the missing evidence was central to both parties, noting that the prosecution would rely on testimony about the brain tissue to establish the time of death, and the defense would rely on scientific examination of the brain to both impeach the Government’s witness and to establish a defense theory as to the time and cause of death. Id. at 969-70. The defense theory of the ease was that the fatal injuries had been inflicted by a baseball bat wielded by appellant’s daughter several weeks earlier, or by the son’s self-abusive head-banging behavior. See id.
Defense counsel asked the military judge to address the harm caused by the missing-evidence by giving an adverse inference instruction, permitting the members to infer a fact against the Government’s interest if the Government lost or destroyed evidence whose content or quality was at issue. Such an instruction would have permitted, but not required, the members to draw an inference against the Government’s theory that Timmy’s death resulted from the beating appellant administered on June 4. The military judge declined to give the requested instruction.
An adverse inference instruction is an appropriate curative measure for improper destruction of evidence. We need not decide, however, whether the military judge erred by refusing to give an adverse inference instruction, because we. hold that any error in this regard was harmless beyond a reasonable doubt in light of appellant’s confession, which we discuss infra.
Extensive evidence was introduced by Timmy’s grandmother, the babysitter, and others, that Timmy was hit on the head with an aluminum baseball bat three weeks earlier by Teresa. Additionally, the defense experts were able to examine the x-rays, the CAT scans, and the medical records to form an opinion as to the timing and cause of death. The defense witnesses indicated, based on this evidence, that there was a pre-existing injury and it was the re-bleeding of that injury that caused Timmy’s death.
Dr. Charles Odom, a defense witness, testified that if there was a pre-existing injury, hitting that area could cause a new injury and the fracture could open. He stated that it would not take the same degree of force to cause a re-injury, swelling, and death in this ease. He opined that the baseball bat injury three weeks prior to Timmy’s death was the traumatic, blunt force injury that caused his sub-acute, subdural hematoma, and death. However, he also testified that there was a real possibility of a different cause of the re-bleeding and, ultimately, death.
The defense, in its closing argument, recognized that appellant would be responsible for any re-aggravation of the bat injury caused by Teresa. As a result, the defense theory was that appellant, contrary to his oral confession under oath, did not hit or strike Timmy on either Friday or Sunday prior to Timmy’s admission to the hospital.
The military judge admonished the Government not to use the missing evidence to impeach the defense expert, and he provided a limiting instruction at the close of the arguments. The judge instructed the mem *381 bers that they were prohibited from giving less weight to the defense expert’s testimony solely because he had not had the opportunity to view or test the lost evidence. Further, the members were instructed that they could consider Dr. Odom’s opinion as to “what he expected the microscopic examination to show even though the brain and its meninges were not available for [his] examination.” 54 MJ at 970-71.
Notwithstanding the military judge’s remedial efforts, trial counsel attacked the credibility of Dr. Odom by emphasizing that he had not examined the lost brain and meninges. There was no objection. Additionally, trial counsel’s closing argument attempted to enhance the credibility of Dr. Arruza by emphasizing that she had access to the lost evidence and, in fact, had done a comprehensive exam. Again, there was no objection. We need not decide, however, whether the military judge’s failure to promptly correct or temper trial counsel’s remarks was plain error because any error was harmless beyond a reasonable doubt in light of appellant’s confession.
“[A] voluntary confession of guilt is among the most effectual proofs in the law, and constitutes the strongest evidence against the party making it that can be given of the facts stated in such confession.” Hopt v. Utah, 110 U.S. 574, 584, 4 S.Ct. 202, 28 L.Ed. 262 (1884). “A deliberate, voluntary confession of guilt is among the most effective proofs in the law.” United States v. Monge, 1 USCMA 95, 97, 2 CMR 1, 3 (1952). As the Supreme Court recently reiterated:
A confession is like no other evidence. Indeed, “the defendant’s own confession is probably the most probative and damaging evidence that can be admitted against him____ Certainly, confessions have profound impact on the jury, so much so that we may justifiably doubt its ability to put them out of mind even if told to do so.”
Arizona v. Fulminante, 499 U.S. 279, 296, 111 S.Ct. 1246, 113 L.Ed.2d 302 (1991) (citations omitted). Thus, appellant’s confession goes far in rendering harmless any error in the military judge’s failure to give an adverse inference instruction or stop trial counsel from commenting on the defense’s inability to examine Timmy’s brain and meninges.
Of course, this assumes appellant’s confession is reliable. False voluntary confessions do exist, and when their reliability is called into question, so too is their otherwise overwhelming power to prove the declarant’s guilt. Moreover, the factual question whether a confession is reliable is for the members of a court-martial to decide. See Mil.R.Evid. 304(e)(2), Manual, supra (once military judge finds confession voluntary as a matter of law and admits it, members determine its voluntariness and reliability as a matter of fact); Jackson v. Denno, 378 U.S. 368, 387 n. 13, 84 S.Ct. 1774, 12 L.Ed.2d 908 (1964).
The question in this case, then, is whether there is a reasonable likelihood the members would have found appellant’s confession was involuntary or unreliable had the military judge given an adverse inference instruction relating to the lost brain and meninges, and stopped trial counsel from commenting on the defense’s inability to examine them. This question arises for the following reasons.
Prior to trial, appellant confessed to brutally beating Timmy on June 2 and 4. At trial, however, the defense denied the beatings on these dates, maintained the confession was fabricated, and argued the cause of Timmy’s death was his sister hitting him on the head with a baseball bat three weeks earlier, or possibly Timmy’s self-abusive, head-banging behavior. In support of this theory, a defense expert testified that the three-week old baseball bat injury was the cause of Timmy’s death, not injuries sustained on June 4, as the Government’s expert concluded.
The defense expert, however, was unable to examine Timmy’s brain. Such an examination may have strengthened his conclusion that the baseball bat injury, not June 4 injuries, was the cause of death. This, in turn, may have been viewed by the members as consistent with appellant’s trial position of a fabricated confession, thereby decreasing the voluntariness or reliability of his confession in their minds.
*382 Similarly, had the military judge given the adverse inference instruction and stopped trial counsel from commenting on the defense’s inability to examine the brain, the voluntariness or reliability of appellant’s confession might also have been questioned by the members. The presence of the requested instruction and absence of prohibited comments could have put the defense in a position similar to the one it would have occupied had the brain not been lost, a position which, as stated above, might have produced a question in the members’ minds about the voluntariness or reliability of appellant’s confession.
Nonetheless, for the reasons that follow, we conclude there is no reasonable likelihood the members would have found appellant’s confession was involuntary or unreliable, even if the military judge had given the adverse inference instruction and stopped trial counsel from making prohibited comments.
At the time of Timmy’s autopsy, he had multiple injuries around his eyes, his cheek, his jaw, his neck, his lips, the left side of his chest, his lower left hip, his right forearm, the right and left sides of his knees, and the right and left sides of his lower legs. Given the magnitude and variety of these injuries— injuries separate and apart from Timmy’s brain injury—there is simply no way the members could conclude they were caused by a single hit to the head with a baseball bat three weeks earlier, or by less traumatic, self-inflicted head-banging.
On this record, the only thing the members could conclude, even with the requested adverse inference instruction and without trial counsel’s questionable comments, was that the multiple injuries Timmy sustained over his face and entire body, independent of his brain injury, had to be caused by the June 2 and 4 beatings described by appellant in his detailed confession, assaults that included numerous hits to the face, grabbing and dragging by the extremities, a full-body knock into a wall, and a full-body fall to the floor from several feet up.
Furthermore, the members were properly instructed on their role in determining the voluntariness and reliability of the confession and that they could not give less weight to the defense expert’s testimony simply because he did not examine the brain, and we assume they did not. See Richardson v. Marsh, 481 U.S. 200, 206, 107 S.Ct. 1702, 95 L.Ed.2d 176 (1987)(“invariable assumption of the law that jurors follow their instructions”). In this context, we hold that appellant’s voluntary, reliable, detailed confession, admitting far more than needed to shield his wife from prosecution, rendered harmless beyond a reasonable doubt any error in the military judge’s failure to give an adverse inference instruction or stop trial counsel from making prohibited comments related to the missing brain. See United States v. Moolick, 53 MJ 174, 177 (2000).
It is important “to distinguish between the discrete issues of voluntariness and credibility____” Jackson, 378 U.S. at 387 n. 13, 84 S.Ct. 1774. There is no question but that appellant’s confession was voluntary as a matter of law, for the reasons set forth in the first part of this opinion. Here, we conclude that by focusing on Timmy’s other injuries, in addition to his brain injury, the members could not help but find appellant’s confession was also voluntary and reliable as a matter of fact.
The decision of the United States Navy-Marine Corps Court of Criminal Appeals is affirmed.

. We heard oral argument in this case at the Georgetown University Law Center, Washington, DC, as part of the Court’s "Project Outreach.” See United States v. Pritchard, 45 MJ 126, 127 n. 1 (1996).

. All Manual provisions cited are identical to those in effect at the time of appellant’s court-martial.