# UNITED STATES ARMY COURT OF CRIMINAL APPEALS

Before
FLOR, POND, and STEELE
Appellate Military Judges

**UNITED STATES, Appellant**
v.
**Specialist JONATHAN E. FEIL**
**United States Army, Appellee**

ARMY MISC 20260004

Headquarters, Seventh Army Training Command
Mitchell D. Herniak, Military Judge
Colonel William J. Stephens, Special Trial Counsel

For Appellant: Captain Teri'el M. Dixon, JA (argued); Colonel Richard E. Gorini, JA; Major Vy T. Nguyen, JA; Captain Nicholas A. Schaffer, JA (on brief and reply brief).

For Appellee: Captain Grant A. Olan, JA (argued); Colonel Frank E. Kostik, Jr., JA; Lieutenant Colonel Kyle C. Sprague, JA; Major Andrew M. Hopkins, JA; Captain Grant A. Olan, JA (on brief).

7 May 2026

-------------------------------------------------------------------------
MEMORANDUM OPINION AND ACTION ON APPEAL
BY THE UNITED STATES FILED PURSUANT TO
ARTICLE 62, UNIFORM CODE OF MILITARY JUSTICE
-------------------------------------------------------------------------

*This opinion is issued as an unpublished opinion and, as such, does not serve as precedent.*

FLOR, Chief Judge:

This case is before us as an interlocutory appeal under Article 62, Uniform Code of Military Justice, 10 U.S.C. § 862 [UCMJ]. Specialist Johnathan Feil (Appellee) is charged with three specifications of sexual assault in violation of Article 120, Uniform Code of Military Justice, 10 U.S.C. § 920 (2024) [UCMJ]. During pretrial litigation, the military judge suppressed a portion of the accused's

statements as involuntary.[1] The government requested reconsideration of the military judge's ruling, which he denied. Within three days of the military judge's ruling, the government provided notice of its intent to appeal pursuant to Article 62, UCMJ.

On appeal, the government argues the military judge erred when he ruled the accused's statements were involuntary. Upon review of the record pursuant to Article 62, UCMJ, we agree the military judge abused his discretion for the reasons further discussed below and grant the government's appeal.

## BACKGROUND

On the evening of 14 December 2024, the accused, the alleged victim (AV), and her husband went to a bar. At around 0300, the accused went back to his barracks room. At around 0400, he received a knock on his door from the AV who asked the accused to stay in his room for the night. The AV alleged the accused committed the charged offenses against her at around 0700. At 0900, the accused went on duty as the Charge of Quarters. Later that same day, Criminal Investigation Division (CID) received the AV's report of sexual assault. At around 2030, CID special agents interviewed the accused after he waived his Article 31(b) rights. During the course of this interview, he made incriminating statements. Before trial, defense filed a motion to suppress those statements as involuntary, which the military judge granted. We discuss the military judge's ruling, to include his findings of fact about the accused's interrogation, further below.

## LAW AND DISCUSSION

### A. Jurisdiction

As a threshold matter, we must determine whether we have jurisdiction to hear this appeal. While neither party directly raises an issue of jurisdiction, appellee's brief argues that because the government only provided notice of appeal for the request for reconsideration, and not the military judge's original ruling, within the 72 hours prescribed by Article 62(a)(2)(A), UCMJ and R.C.M. 908(b)(3), the scope of our review is limited to the military judge's ruling on the request for

---

[1] As explained later in this opinion, the military judge bifurcated the interview into two parts, the non-confrontational portion and the confrontational portion. The dividing line between the two portions was the thirteen-minute break given to the accused. However, the military judge only suppressed the confrontational portion starting at the 18-minute mark—after the conclusion of the break—right before the accused made his first admission.

reconsideration.[2] At oral argument, however, counsel for the accused conceded the jurisdiction question as moot. While we appreciate this concession, we must ourselves be convinced of our jurisdiction. *See United States v. Jacobsen*, 77 M.J. 81, 85 (C.A.A.F. 2017) (holding that during an Article 62, UCMJ, appeal "as a matter of law we are convinced that the ACCA had to satisfy itself that it had appellate jurisdiction before proceeding to review the merits of the appeal").

We observe that the government's notice of appeal only mentioned the ruling on reconsideration. However, as noted by the government, the military judge's ruling on reconsideration affirmed and explained his original ruling, making them inextricably linked. In particular, the military judge's ruling on request for reconsideration states, in relevant parts, "The Court reaffirms its prior findings of fact," "In affirming its prior ruling, the Court provides the following additional analysis," and "The Court's 25 November 2025 ruling is affirmed." The government cites to *United States v. Daly*, where our superior court stated that the CCA no longer had jurisdiction when, "[t]he Government failed to file either a motion for reconsideration of the order to dismiss or a notice of appeal within the seventy-two-hour period for government appeals authorized in Article 62(a)(2)." 69 M.J. 485, 486 (C.A.A.F. 2011). The government also cites *United States v. Wright*, where we stated, "The military judge denied appellant's request for reconsideration . . . At that point, and assuming the request for reconsideration was timely, appellant had 72 hours to file written notice of an interlocutory appeal under Article 62, UCMJ, and R.C.M. 908(b)(3)." 2025 CCA LEXIS 466, at *8 (Army Ct. Crim. App. 29 Sep 2025). Finally, the government cites to our sister court's recent opinion in *United States v. Smith*, where the Navy-Marine Corps Court of Criminal Appeals held that a timely "motion for reconsideration renders the underlying ruling non-final for purposes of appeal." 85 M.J. 565, 572 (N.M. Ct. Crim. App. 2025).

In Appellate Exhibit XVIII, the military judge laid out the relevant timeline:

0931, 25 Nov 25: Military Judge ruling on the Defense Motion
0552, 28 Nov 25: Government Motion to Reconsider filed

---

[2] Rule for Court-Martial (R.C.M.) 908(b)(3), states, in relevant part, "If the United States elects to appeal, trial counsel shall provide the military judge with written notice to this effect not later than 72 hours after the ruling or order. Such notice shall identify the ruling or order to be appealed, and the charges and specifications affected." R.C.M. 908(b)(3) restates Article 62(a)(2)(A), UCMJ: "An appeal of an order or ruling may not be taken unless the trial counsel provides the military judge with written notice of appeal from the order or ruling within 72 hours of the order or ruling. Such notice shall include a certification by the trial counsel that the appeal is not taken for the purpose of delay and (if the order or ruling appealed is one which excludes evidence) that the evidence excluded is substantial proof of a fact material in the proceeding."

1204, 9 Dec 25: Military Judge ruling on the Motion to Reconsider
0939, 12 Dec 25: Government Notice of Appeal under Article 62 filed

As shown in this timeline, the government filed its motion to reconsider within 72 hours of the original ruling, and the government filed its notice of appeal within 72 hours of the reconsideration ruling.

The question we are left to resolve is whether a timely motion for reconsideration tolls the 72-hour statutory clock in Article 62(a)(2)(A). If so, we have jurisdiction. If not, we must dismiss the government's Article 62 appeal as untimely. While Article 62(e) states that "[t]he provisions of this article shall be liberally construed to effect its purposes," the timelines for an Article 62 appeal are strict and must be followed. *See Daly*, 69 M.J. at 486 (holding that the CCA lacked jurisdiction under Article 62 where the government took 12 days to request the judge to reconsider an order to dismiss, but then later filed the Article 62 appeal within 72 hours of the military judge denying the motion for reconsideration).[3]

We are convinced of our jurisdiction to review both the original ruling of the military judge and the ruling on reconsideration. The holding in *Daly* is clear that the government must file *either* a motion for reconsideration or a notice of appeal within 72 hours of the military judge's ruling "which excludes evidence that is substantial proof of a fact material in the proceeding." Article 62(a)(1)(B). We are persuaded by our sister court's analysis in *Smith*, stating that Article 62 was modeled after 18 U.S.C. § 3731, the federal government appeals statute. Our superior court has therefore relied upon those cases interpreting 18 U.S.C. § 3731 as guidance to interpret Article 62:

> Congress authorized federal civilian government appeals in criminal cases under 18 U.S.C. § 3731 before it authorized them in the military, and modeled Article 62, UCMJ, in large part, after 18 U.S.C. § 3731. Consequently, it is proper for this Court to look to cases interpreting it for guidance. However, the statutes are not identical, and this Court has recognized that guidance does not mean binding precedent, in the interpretation of Article 62.

*Jacobsen*, 77 M.J. at 86 (internal quotations and citations omitted).

---

[3] In this case before us, the military judge stated in his ruling on reconsideration that the trial counsel emailed the military judge on 26 November, notified him that it planned to file a motion to reconsider, and requested until 1 December to file the motion to reconsider. The military judge granted this request, but the trial counsel still filed the motion to reconsider within 72 hours of the original ruling.

Our sister court in *Smith* cited a line of Supreme Court cases that provided the government with the opportunity to petition a lower court for the review of legal errors. *Smith*, 85 M.J. at 568, (citing *United States v. Healy*, 376 U.S. 75 (1964) (holding that a timely petition for rehearing within 30 days[4] gives the government 30 days to appeal after action by the court on the petition for rehearing); *United States v. Dieter*, 429 U.S. 6 (1976) (striking down a Tenth Circuit attempt to carve out an exception to *Healy* if the petition for rehearing does not assert an alleged error of law); and *United States v. Ibarra*, 502 U.S. 1 (1991) (again striking down a Tenth Circuit attempt to carve out an exception to *Healy* for "meritless" motions for reconsideration)). While we will not cover these in detail, the overarching theme is the Supreme Court's view on motions for reconsideration is, "Of course speedy disposition of criminal cases is desirable, but to deprive the Government of the opportunity to petition a lower court for the correction of errors might, in some circumstances, actually prolong the process of litigation – since plenary consideration of a question of law here ordinarily consumes more time than disposition of a petition for rehearing . . . ." *Healy*, 376 U.S. at 80.

We agree with the government that the two rulings are inextricably linked, particularly in light of the military judge's statements in his ruling on reconsideration further explaining and expressly affirming his original ruling. Therefore, even assuming that we are either bound by the government's notice of appeal that notified the trial court that they were only appealing the ruling on reconsideration or we are bound to treat an Article 62 appeal as timely only regarding the ruling on reconsideration, we find that the military judge adopted his original ruling into his ruling on reconsideration, making them both the subject of this Article 62 appeal.

Neither party contests that the accused's statements to CID are substantial proof of a material fact. In light of the nature of the accused's admissions about the charged offenses, we agree. Thus, we are satisfied that we have jurisdiction to review this appeal.

### B. Voluntariness

### 1. Additional Facts

The original ruling of the military judge covers forty-one pages, and the ruling on reconsideration covers five pages. Therefore, only the most relevant fact determinations made by the military judge in both rulings are summarized below:

---

[4] 18 U.S.C. § 3731 contains a 30-day time limit for government appeals instead of the 72-hour time limit from Article 62, UCMJ.

(1) At the time of the interview, the accused was twenty-two years old and had one year and ten months of active-duty service. His GT score was 119. The accused is a high school graduate but dropped out of community college after a few weeks due to a football injury. The accused weighs 260 pounds and is 6 feet, 3 inches tall.

(2) The accused had no interaction with law enforcement prior to the interview, outside of a traffic ticket, and had no interaction with the military justice system. The accused respected law enforcement. However, the accused's brother was convicted of double murder in 2019.

(3) On the day of the charged offenses and the interview, the accused did not get much sleep. The military judge found that the accused "got at most slightly over four hours of sleep in the twenty-four hours prior to the interview." The accused reported for a CQ shift at 0900, and prior to that he had slept at most two hours. He was given a break from CQ from shortly after 0900 until 1130 but only slept for around 15-20 minutes during this break. After resuming his CQ shift at 1130, the accused was given another break from 1600 until 1945, during which time he was able to get at most 2.5 hours of sleep until he was awakened by a knock at his door.

(4) The interview took place in a small, windowless room, with no decorations. The room contained a small desk and three chairs. The accused was seated in the corner with his back to the wall. The interviewing agent sat in front of the accused, while the other sat at the other end of the desk from the accused.

(5) The military judge found that "a valid rights waiver was executed, and the [a]ccused freely, knowingly, and intelligently waived his rights under Article 31(b), UCMJ."

(6) CID's interview of the accused lasted approximately two hours and four minutes. This interview consisted of two main parts: the "non-confrontational, interview portion" that lasted forty-three minutes after the rights advice was completed and the "confrontational/interrogation portion" that lasted around one hour after the conclusion of the break between these two parts. The accused's first admission at issue occurred approximately eighteen minutes into the "confrontational" portion of the interview.

(7) The accused was afforded one thirteen-minute break after the "non-confrontational, interview portion." During this break, the accused was given a small package of chips, a Rice Krispie treat, and a twelve-ounce can of Sprite, which he consumed during the break. This was the only food

consumed by the accused during the entire day, a fact which the accused told CID a few moments before the break.

(8) Neither agent yelled or raised their voices at the accused and "spoke at essentially the same volume throughout the entire interview." With the exception of "a few instances where [the interviewing agent] described the [a]ccused's story as 'shit' or 'bullshit,' he did not curse at the [a]ccused."

(9) However, the main CID agent doing the questioning "never sat more than three feet from the [a]ccused and at some points moved closer." And, this same CID agent twice told the accused that he would call the accused's colonel and tell the colonel that he was lying. Finally, during the confrontational portion of the interview, this agent told the accused he was lying twenty-one times over the span of the first eighteen minutes after the break.

(10) The following six factors describe tactics employed by CID that the military judge found particularly relevant: the agent "incessantly" told the accused he was lying; the agent told the accused he was "not telling the truth" twenty-one times in eighteen minutes; on two occasions, the agent told the accused he "would tell his 'colonel' he was lying"; the agent "unequivocally told the [a]ccused he was going to get into trouble"; the agent told the accused "the only thing he had left was to tell the truth"; and the agent kept telling the accused "to 'hit the rewind' button."

(11) On eight occasions, the accused made admissions after the interviewing agent suggested a certain response or that the response the accused previously provided was a lie.

(12) The military judge determined "the effect of the incessant use of [CID's] techniques in the manner in which [CID] used them led to the [a]ccused providing answers suggested by [CID]."

(13) The military judge found "no evidence" that the CID agents "exploited any physical or mental condition of the [a]ccused." And even though the lead CID agent was told that the accused had "very little sleep prior to the interview and had worked a CQ shift, there is no evidence [CID] attempted to leverage this against the [a]ccused."

(14) After the interview, the CID agents left the accused in the interview room with the camera still recording. The military judge found the accused made "17 intelligible statements to himself . . . all but one of those statements involved what appears to be the [a]ccused questioning the version of events he

7

had provided to [CID]." For example, the accused said "God, did I do this? I don't, I don't remember it that way" and "There's no way I did this."

Based on the foregoing facts, the military judge found that the totality of the circumstances showed the accused's statements from the 18-minute mark into the "confrontational/interrogation portion" of the interview and forward were involuntary "in that they were not the product of an essentially free and unconstrained choice." His analysis is summarized below:

(1) Mental condition of the accused: The military judge determined lack of sleep "weighs in favor of suppression when viewed in conjunction with the objective, video evidence of the [a]ccused's confusion and fatigue during the interrogation portion of the interview." Lack of food, however, based on the lack of objective evidence that hunger was bothering the accused, did not significantly influence the military judge's decision—specifically, the military judge notes he did not "place great emphasis on this factor." Similarly, the military judge did not find objective evidence that the accused's hangover was a factor nor that the accused ever mentioned being hungover to CID. The military judge found no prior interactions with law enforcement.

(2) Age, Education, Intelligence: The military judge found the accused's age and limited military experience to be "significant factors," while diminishing the accused's high GT score of 119 since it "does not per se suggest an individual is immune from psychological pressure during an interrogation."

(3) Conditions of the Questioning and Rights Warning: Describing the interview room, the military judge notes that while "the room was small but not cramped . . . plenty of space." The military judge found the rights advice to be valid, and that twice the lead agent told the accused he could terminate the interview at any time.

(4) The Manner of the Interview/Interrogation: The military judge found "the manner of the interrogation to have produced an involuntary statement due to unlawful coercion." The military judge finds the agent's "techniques are acceptable in isolation, and in many circumstances, the aggregate. However, under the facts of this case, [the military judge] finds the combination and frequency with which these tactics were used, the manner in which they were used, and the *outcome they produced*, favor suppression." [emphasis added].

(5) Length of the Interrogation: The military judge "acknowledges that an interrogation lasting approximately one hour with an admission arising within [sic] the first eighteen minutes is, in isolation, unimpressive, and unfavorable to involuntariness but not dispositive," and that "eighteen minutes is a short time for someone's will to be overborne particularly when preceded by a

nonconfrontational interview." But the military judge then refers back to the tactics employed to find the length of the interview favors suppression because of the density of tactics used during a small window of time: "twice threatened with the possibility of his 'colonel' being told he is lying . . . told the accused 21 times he was not telling the truth, and . . . unequivocally told the accused he was going to get into trouble." The military judge was "concerned not by the amount of time but rather the density of that eighteen minutes."

(6) Use of Force, Threats, Promises, or Deceptions: The military judge did not find CID's use of deception "significant," but he did find the "references to the [a]ccused's 'colonel' significant," and to be "threats . . . specifically designed to use the [a]ccused's chain of command to pressure the [a]ccused."

(7) The accused's Post-Interview Statements to Himself: The military judge found the accused statements to himself after the interview/interrogation "further support a finding that the answers he provided that [CID] accepted were not the product of an essentially free and unconstrained choice."

The military judge then suppressed the statements of the accused from the 18-minute mark into the "confrontational/interrogation portion" of the interview and forward due to "unlawful coercion."

### 2. Law

We review a military judge's ruling suppressing evidence for abuse of discretion. *United States v. Jasper*, 72 M.J. 276, 279 (C.A.A.F. 2013). An abuse of discretion occurs when a military judge's "findings of fact are clearly erroneous or his conclusions of law are incorrect." *United States v. Erikson*, 76 M.J. 231, 234 (C.A.A.F. 2017) (internal quotation marks omitted) (quoting *United States v. Olson*, 74 M.J. 132, 134 (C.A.A.F. 2015)). When ruling on government interlocutory appeals made pursuant to Article 62, UCMJ, our court "may act only with respect to matters of law." *United States v. Aguilar*, 2008 CCA LEXIS 560, *9 (Army Ct. Crim. App. 25 Jan 2008). We must "review[] the evidence in the light most favorable to the party which prevailed at trial," which in this case is the accused. *United States v. Hurtado*, __ M.J. ___, ___, 2026 CAAF LEXIS 273, *4 (C.A.A.F. 23 Mar 2026) (quoting *United States v. Becker*, 81 M.J. 483, 488 (C.A.A.F. 2021) (further citation omitted)).

During review, we may not make additional findings of fact; rather, "[o]n questions of fact, [our] court is limited to determining whether the military judge's findings are clearly erroneous or unsupported by the record. If the findings are incomplete or ambiguous, the 'appropriate remedy . . . is a remand for clarification' or additional findings." *United States v. Lincoln*, 42 M.J. 315, 320 (C.A.A.F. 1995)

(quoting *United States v. Kosek*, 41 M.J. 60, 64 (C.M.A. 1994)). This court may not "find its own facts or substitute its own interpretation of the facts." *United States v. Cossio*, 64 M.J. 254, 256 (C.A.A.F. 2007) (citing *United States v. Mizgala*, 61 M.J. 122, 127 (C.A.A.F. 2005)). However, we review questions of law de novo. *Kosek*, 41 M.J. at 63; *United States v. Rittenhouse*, 62 M.J. 509, 511 (Army Ct. Crim. App. 2005).

The Fifth Amendment to the United States Constitution states: "No person . . . shall be compelled in any criminal case to be a witness against himself." Article 31(a), UCMJ, further provides that "[n]o person subject to this chapter may compel any person to incriminate himself or to answer any question the answer to which may tend to incriminate him." To protect these rights, Military Rule of Evidence [hereinafter Mil. R. Evid.] 304 provides that "an involuntary statement from an accused, or any evidence derived therefrom, is inadmissible at trial." If the accused moves to suppress a statement under Mil. R. Evid. 304, the prosecution has the burden of establishing the admissibility of the statement, and the military judge must find by a preponderance of the evidence that a statement by the accused was made voluntarily before it may be received into evidence. Mil. R. Evid. 304(f)(6), (7). A statement is "involuntary" for the purposes of Mil. R. Evid. 304 if it is "obtained in violation of the self-incrimination privilege or Due Process Clause of the Fifth Amendment, Article 31, or through the use of coercion, unlawful influence, or unlawful inducement." Mil. R. Evid. 304(a)(1)(A).

The voluntariness of a confession is a question of law reviewed de novo. *United States v. Bubonics*, 45 M.J. 93, 94 (C.A.A.F. 1996) (citing *Arizona v. Fulminante*, 499 U.S. 279, 287 (1991); *United States v. Martinez*, 38 M.J. 82, 86 (C.M.A. 1993)). The necessary inquiry is whether the confession is the product of an essentially free and unconstrained choice by its maker. If, instead, the maker's will was overborne and his capacity for self-determination was critically impaired, use of his confession would offend due process. *Bubonics*, 45 M.J. at 95, citing *Culombe v. Connecticut*, 367 U.S. 568, 602 (1961). For the purposes of determining whether an accused's will is overborne, a judge should make their determination "with complete disregard of whether or not [appellant] in fact spoke the truth." *Rogers v. Richmond*, 365 U.S. 534, 544 (1961).

In determining whether a defendant's will was overborne in a particular case, this court assesses the totality of all the surrounding circumstances, both the characteristics of the accused and the details of the interrogation. *Schneckloth v. Bustamonte*, 412 U.S. 218, 226 (1973). "In assessing the totality of the circumstances, we will look to factors such as: the mental condition of the accused; his age, education, and intelligence; the character of the detention, including the conditions of the questioning and rights warning; and the manner of the interrogation, including the length of the interrogation and the use of force, threats, promises, or deceptions." *United States v. Bresnahan*, 62 M.J. 137, 141 (C.A.A.F.

2005) (citing *United States v. Ellis*, 57 M.J. 375, 379 (C.A.A.F. 2002)); *United States v. Freeman*, 65 M.J. 451, 453 (C.A.A.F. 2008).

In *Colorado v. Connelly*, 479 U.S. 157, 166 (1986), the Supreme Court overturned the suppression of a confession as "involuntary," in violation of the due process clause of the Fourteenth Amendment, where there was no predicate of coercive police activity. In *Connelly*, the confessor suffered from a mental illness that impacted his volition (termed by his counsel as his rational intellect and "free will"). The Colorado Supreme Court upheld suppression of the confession but found the police had done nothing wrong or coercive in securing the confession. 479 U.S. at 166. The Supreme Court, in overturning the suppression of the confession, declined to expand "voluntariness" to require that courts determine a defendant's motivation for providing a statement in the absence of government coercion. *Id.* at 165-166. The Court of Military Appeals, now the Court of Appeals for the Armed Forces (CAAF), recognized the same prerequisite of "coercive police activity" when that court affirmed the trial court's suppression of a confession in *Martinez*.[5]

### 3. Discussion

We find the military judge abused his discretion in suppressing the accused's statements based on the following determinations: (1) the military judge erred as a matter of law when he found that CID's tactics amounted to unlawful coercion; (2) the military judge failed to consider important facts as highlighted by the government in its motion for reconsideration; and (3) exercising our powers of review and applying the findings of fact to the law, we hold that the accused's statements were voluntary.

We first address the military judge's findings of fact. As noted above, we recognize that in this Article 62, UCMJ review, we are bound by the military judge's findings of fact as true and correct unless we find them to be clearly erroneous or unsupported by the record. *See Lincoln*, 42 M.J. at 320. The military judge's findings of fact are generally thorough and not clearly erroneous.

However, we find the military judge failed to consider important facts which the government highlighted in its motion for reconsideration. *See e.g., United States v. Commisso*, 76 M.J. 315, 321 (C.A.A.F. 2017) (stating a military judge abuses his discretion if "he fails to consider important facts"). The trial counsel argued the military judge's initial ruling failed to consider that the accused, despite his veracity being challenged by CID, maintained some of his previous statements, or at the very minimum, responded with his own version of events after the eighteen minutes during which the military judge determined the accused's will was overborne. The trial counsel cited to *United States v. Lowery*, where this court stated, "'consistent

---

[5] 38 M.J. at 85 n.*.

assertion that disagrees with [an a]gent's questioning is fundamentally antithetical to finding that [an appellant's] will was overborne.'" 2024 CCA LEXIS 540, (Army Ct. Crim. App. 2024). In support of his argument, the trial counsel accurately captured specific instances where the accused continued to push back and disagree with the agent.[6] While the accused eventually conceded in part or in whole many of these points, certain assertions the accused never conceded include: (1) that the AV was conscious throughout;[7] (2) that the AV stayed with him for hours afterwards; (3) that he and the AV were kissing; (4) the reasons for the AV's declination of oral sex; and (5) that the accused did not know his actions were wrong at the time.[8]

In his ruling on reconsideration, the military judge only addressed the last point and further stated that the accused's responses further supported a finding of involuntariness because "the [a]ccused did not provide a consistent assertion disagreeing with [the CID Agent]" but rather "shifted from one discussing a completely consensual encounter to one where the [a]ccused admitted to sexually assaulting the AV." The military judge's rationale, however, reflects a circumstance that is true of many confessions where an accused at first denies wrongdoing and upon further interrogation, ultimately, confesses. While the military judge stated he did not find the accused's qualifying language that he did not know the wrongfulness of his actions at the time equated to consistent disagreement, the military judge failed to resolve the other instances in which the accused rejected the CID agent's version of events. These instances of opposition also contradict the military judge's finding that the accused's statements from 22:01:25 forward were ". . . in one form

---

[6] *See* accused interview at 22:05:40 (in response to the agent saying ". . . you did not say that to her," the accused responded, "I did ask her."); *see also* 22:07:05 (in response to the agent saying ". . . let's go back to that question, did you ever ask her if she is okay with it?" the accused said, "I did ask her . . .").

[7] Notably, the military judge points out in his facts and analysis that the interviewing agent told the accused he believed he waited until the AV was almost asleep and then put his hand in her panties. *See also* accused interview at 21:56:02 ("You waited until she was about asleep, then you made your move on her."); 21:51:58 ("I do think she was laying there when she was about asleep and that you put your hand down her panties . . ."). Throughout the interview, the accused maintains adamant the AV was completely awake and that she was facing him with her eyes open.

[8] Notably, even near the very end of appellant's interview (22:38:40), when asked if he knew what he was doing was wrong, appellant responded, "At the time, no." *See also* accused's interview at 22:12:35 (in response to the agent saying "you knew what you were doing was wrong, right?" the accused responded "At the time I didn't."); accused interview at 22:15:55 (in response to the agent, again, asking "how did you know what you did was wrong then?" the accused replied "at the time I didn't.").

or another a regurgitation [of] statements [the interviewing agent] told him were the truth."

We also note that the military judge included in his findings of fact that "the [a]ccused intentionally lied to CID," which he later referred to in his analysis. The truth or falsity of an accused's statement is not a proper consideration in determining voluntariness. *See Rogers*, 365 U.S. at 544 (stating we determine voluntariness "with complete disregard of whether or not [appellant] in fact spoke the truth."). In fact, the "aim of the requirement of due process is not to exclude presumptively false evidence, but to prevent fundamental unfairness in the use of evidence, whether true or false." *Lisenba v. California*, 314 U.S. 219, 236 (1941). However, the military judge also stated in two footnotes to his analysis that it was not his place to opine on the truth or falsity of the accused's statements to CID. Given these later statements, we will presume the military judge followed the law and did not consider the truth or falsity of the accused's statement in making his ruling.[9]

We find no reason to otherwise set aside the military judge's factual findings regarding the characteristics of the Accused and the details of the interrogation. We do, however, find the military judge abused his discretion and erred as a matter of law when he determined the accused's statement was a result of unlawful coercion in the absence of any police misconduct or overreaching. As this court previously stated, "Absent police misconduct causally related to the confession, there is simply no basis for concluding that any state actor has deprived a criminal defendant of due process of law in the taking of the confession." *United States v. Aguilar*, 2008 CCA LEXIS 560 at *16 (Army Ct. Crim. App. 25 Jan 2008). While "the mental condition of [an accused is] a more significant factor" to consider where police tactics "have turned to more subtle forms of psychological persuasion," there must be nevertheless an "essential link between coercive activity of the government, on the one hand, and a resulting confession by a defendant, on the other." *Id.* at *17-18. Here, the military judge acknowledged that the agent's "techniques are acceptable in isolation, and in many circumstances, the aggregate." He also found no evidence that CID exploited or attempted to exploit the accused's physical or mental condition, to

---

[9] First, in addressing the accused's contradictory testimony during the Article 39(a) hearing, the military judge explained he did not believe the accused was trying to lie during the hearing and, separately, that his role was not to determine the truth or falsity of the accused's statements during the interview, "but rather whether his statements were voluntary." Second, the military judge placed a footnote after the heading "Ruling" where he stated "[i]n making this ruling, the Court is not making a determination as to whether the statements provided by the [a]ccused are true or untrue but only whether the statements he provided were voluntary." Subsequently, the military judge granted the accused's motion in-part and denied it in-part, excluding only the inculpatory portion of the interview.

include the accused's lack of sleep. As in *Aguilar*, the military judge's factual findings contradict his conclusion of "unlawful coercion."

We recognize that the determination of whether to suppress a confession is always a case-by-case determination. Likewise, we are cognizant that there is no requirement to weigh all of the relevant factors in determining the voluntariness of a confession equally. While the military judge declined "to engage in what would inevitably be a lengthy comparing and contrasting of subjective analyses none of which on either side of the issue at bar would yield a definitive, controlling result," we find a review of the case law informative to the analysis of the totality of the circumstances, both the characteristics of the accused and the details of the interrogation.

For example, in *Freeman*, the CAAF considered a confession in the context of an accused who had slept for only six hours prior to his interview, although the accused denied any fatigue. 65 M.J. at 454. As was the case here, during the interview, the agents lied to the appellant about the evidence and advised him that they would tell his commander whether or not he cooperated. *Id.* at 455. Also similar to this case, the appellant in *Freeman* never complained about the process, never asked for an attorney, never asked to stop the interview or leave, and never indicated that he felt coerced or pressured into making a statement. *Id.* at 454. Although, unlike this case, the accused drafted his statement alone outside the presence of the investigators, the interview in *Freeman* lasted *ten* hours, and the agents threatened that if appellant did not cooperate, they would turn his case over to civilian authorities where he would face stiffer punishment. *Id.* at 455-56. After noting that "lies, threats, and inducements are not determinative," and taking into consideration the fact that appellant was neither physically abused nor threatened with such abuse, the CAAF held that under the totality of the circumstances appellant's confession was voluntary. *Id.* at 455-457 (citations omitted).

Along the same lines, in *United States v. Ellis*, 57 M.J. 375, 377-79 (C.A.A.F. 2002), the CAAF held that the confession was voluntary even though the agents threatened appellant that his failure to cooperate would increase the risk that his children would be taken away. This was especially true given that there were no other threats, no physical abuse, the questioning did not continue for days, and there was no prolonged isolation. Similarly, in *United States v. Bresnahan*, 62 M.J. 137, 141-42 (C.A.A.F. 2005), the CAAF held that the confession was voluntary even though the detective's statements to appellant were made with the intent to secure a confession by "exploiting any emotional ties Appellant might have" to his infant son. As in both *Freeman* and *Ellis*, the CAAF in *Bresnahan* held that "we must look not only to what was said to Appellant, but 'we must also examine what was not done or not said.'" And again, because the detective did not threaten to physically harm appellant, was not confrontational or intimidating, and did not question appellant for a prolonged period of time, the CAAF ultimately concluded that his

confession was voluntary. *Id.* at 142. See also *United States v. Lewis*, 78 M.J. 447, 453-55 (C.A.A.F. 2019) (holding that even though appellant was an E-4 with low or below average intelligence, his confession was voluntary where appellant did not complain about the process, never asked for an attorney, did not in any way indicate that he felt coerced or pressured into making a statement, there were no threats, lies, or physical abuse, and appellant was not denied any material comforts).

In *United States v. Campbell*, 2007 CCA LEXIS 107 (N.M. Ct. Crim App. 29 Mar 2007), our sister court addressed the voluntariness of a confession in which an E-4 had been out drinking all night and only had three hours of sleep prior to his interview with law enforcement. During the course of the interrogation, which lasted over fourteen hours, the agents tried to convince appellant that it was hopeless to deny his involvement in the murder and that "his only way out was to confess." The agents also referenced appellant's commanding officer and advised him that the maximum penalty for premeditated murder was the "the needle." In addition, the agents lied about the evidence, and tore up appellant's first written statement, calling it a lie. Nevertheless, and notwithstanding the fact that appellant felt hungover, tired, and dehydrated from his lack of sleep and prior alcohol consumption, the NMCCA pointed out that there were no threats or physical violence, the questioning did not continue for days, and there was no detention or isolation for a prolonged period of time. *Id.* at *32, citing *Ellis*, 57 M.J. at 379. As such, the Court in *Campbell* held:

> Viewing all the facts taken together, we find that the appellant was old enough and intelligent enough to make an informed waiver of his rights, and that his waiver was voluntary. We further conclude that the NCIS agents' interrogation tactics were not inherently coercive and did not overcome the appellant's will to resist. We therefore conclude that the appellant's statements were voluntary.

*Id.* at *32 (citing *United States v. Washington*, 46 M.J. 477, 482 (C.A.A.F. 1997) (accused's confession held voluntary despite continuous interrogation for more than two days including mistreatment)). While we acknowledge that *Campbell* was an Article 66, UCMJ review of the military judge's *denial* of a motion to suppress, we nevertheless find its reasoning and analysis persuasive in this case.

Similarly, in *Aguilar*, discussed above, this court reversed the military judge's suppression of an accused's confession in the absence of police misconduct. 2008 CCA LEXIS 560 at *16. In *Aguilar*, the accused while deployed to Iraq as an infantryman was subject to a ten-hour interview after just completing a ten-hour shift "outside the wire as a gunner" which was immediately preceded by a nineteen-hour shift—with a seven-hour break between shifts. Despite the accused's lack of sleep the few days preceding the interrogation and his low intellect, the court found

the accused's will was not overborne by fatigue or low intelligence in the absence of unfair or coercive police activity.

Finally, and not surprisingly, it is worth noting that in the cases where the CAAF has affirmed the suppression of a confession, the facts are far more egregious than those now before us. For example, in *Bubonics*, the appellant was apprehended, placed in irons, and transported to a small interrogation room. When he refused to confess to the first "good guy" interrogator, a second "bad guy" agent stormed into the room, vented his wrath, and "yelled at the accused that he didn't have time for the accused, and that he could sign a warrant to have him arrested by the Virginia Beach Police"; and "slammed the door when he left the door way. . . ." Likewise, in *United States v. Martinez*, 38 M.J. 82, 85-87 (C.M.A. 1993), the accused was a reservist who, despite his significant efforts, was unable to obtain legal counsel for his CID interview, and whose reserve unit advised him to train elsewhere. This complete lack of support from his unit, combined with the fact that his actions were the subject of extensive negative media coverage, ultimately caused appellant to "crack[] and g[i]ve up" at his CID interrogation—which also involved a polygraph.[10]

---

[10] The CMA was "influenced, however, by the fact that the military judge was particularly impressed with appellant's own testimony. In listening to testimony that covers over 75 pages of the record and in watching appellant carefully in the course of delivering it—his manner and demeanor—the military judge was in a unique position to decide the appropriate weight to give appellant's assertion of an overborne will." 38 M.J. at 86. The military judge in this present case was in a similar position to view the testimony of the accused, and we give him the same deference the CMA gave the military judge in *Martinez*. However, we also note that times have changed. In 1993, when *Martinez* was decided, there were very little if any videotapes or audiotapes of confessions of accused Soldiers. In this case, we have the exact same high-resolution video of the interview used by the military judge in making his ruling. Mindful that we are precluded from making our own findings of fact in an Article 62, UCMJ appeal, we see nothing that would preclude an appellate court from determining that a military judge's factual findings are contradicted by such video evidence. We write this footnote to highlight that it might be time for the law to evolve to keep up with technology. For example, maybe the future state of the case law requires us to give a sliding scale of deference to the military judge. If we have access to digital copies of *almost* everything the judge had when making his ruling, perhaps the level of deference to provide is also lessened. If we do not have that level of access to the evidence, perhaps we apply the law as it currently stands. *Cf. United States v. Harvey*, 85 M.J. 127, 130 (C.A.A.F. 2024) (holding in a factual sufficiency context that "appropriate deference" depends "on the nature of the evidence at issue"; when a CCA can "assess documents, videos, and other objective evidence just as well as the court-martial, the CCA might determine that the appropriate deference required is low").

*Id.* at 85. *See also United States v. Planter*, 18 U.S.C.M.A 469, 472-73 (C.M.A. 1969) (suppressing confession where investigator's "not even subtle" approach consisted of a yelling tirade designed to push appellant "towards an emotional state by attempting to degrade him").

We are also less persuaded than the military judge to find the accused's statements involuntary based upon the outcome of the accused's interrogation. First, we find, as previously discussed, conflicting evidence to the military judge's conclusion that the accused's statements were in one form or another a mere regurgitation of the CID agent's version of events. In several instances, the accused continued to push back and disagree with the agent on certain statements—such as whether the AV was conscious and whether he asked the AV for consent—after the eighteen minutes during which the military judge determined the accused's will was overborne. Similarly, the accused's post-interview statements to himself, where he appears to question his recollection of events, would certainly be relevant to a factfinder on the reliability of his statements. We find it less relevant, however, as to the voluntariness of an accused's statement in the absence of unlawful coercion. *See Aguilar*, 2008 CCA LEXIS 560 at *21 (stating "[d]etermining credibility is the role of the trier of fact when considering what weight to give a statement admitted into evidence under Mil. R. Evid. 304(e)(2), not the role of the military judge as a matter of law in determining voluntariness.").[11]

In exercising our de novo review of the question of voluntariness, applying the military judge's findings of fact to the correct law, we must conclude that the accused's statements in this case were voluntary. In coming to this conclusion, we considered the details of the interrogation. The overall length of the interview was only two hours and twenty-three minutes in duration and the interrogation portion only lasting one hour. During that one hour, the accused was confronted for approximately eighteen minutes before providing his first suppressed admission. The confrontation occurred after a thirteen-minute break where the accused was provided with food and drink. The CID agent never yelled at the accused and spoke at the same volume throughout the interview, and with a few exceptions, did not curse. The CID agent employed interrogation techniques courts have found not to be coercive to include (1) imploring the accused to not lie and to tell the truth; (2) telling the accused they would inform his commander that he lied; (3) stating the accused would get in trouble; and, (4) being deceptive about the evidence. As highlighted in the discussion above, it is not coercive to admonish someone to tell the truth or to recite potential penalties for lying. *See e.g., Freeman*, 65 M.J. at 455.

---

[11] Mil. R. Evid. 304(e)(2) is now Mil. R. Evid. 304(g). The rule is substantially the same, but the newer version deletes the final sentence, which states, "When trial is by military judge without members, the military judge shall determine the appropriate weight to give the statement." Compare M.C.M. 2005 with M.C.M. 2024.

Nor does referencing an accused's commander necessarily render a statement involuntary. *Id at 454; Washington,* 46 M.J. at 482. While the agent lied about the evidence, courts have found such deceptions permissible. *See Freeman,* 65 M.J. at 456. Here, CID made no false promises nor threats of physical harm. Nor did the agents exploit or leverage the accused's tiredness. As the military judge acknowledged, the accused told CID that he had had "good rest" prior to the interview. The accused never complained of being fatigued or claimed that his lack of sleep was affecting his ability to comprehend and participate in the interview. While the accused does put his head in his hands a few times, there was no finding that the accused fell asleep or failed to respond coherently or intelligently to the agent's questions.

We also considered the characteristics of the accused who is a twenty-two-year-old Soldier with a GT score of 119, which is considered above average. Like all Soldiers, the accused is trained to follow orders and like many Soldiers, the accused views law enforcement as authority figures. We find no reason to reject the military judge's findings regarding the accused's lack of sleep. However, even viewing the facts in the light most favorable to the prevailing party, and giving significant deference to the fact that the military judge was uniquely positioned to assess the accused's Article 39(a) testimony, we do not find the accused's level of fatigue or his ordinary respect for law enforcement caused his will to be overborne in the absence of unlawful police coercion. The average U.S. Army Soldier runs on some combination of caffeine, nicotine, and not enough sleep the latter of which can result from training, duty, deployments, or off-duty activities. We see nothing unusual or extraordinary about the accused's lack of sleep or degree of tiredness that would render his statements involuntary in light of the details of the interrogation.

Accordingly, for all of the reasons set forth above, we determine the military judge's conclusions of law are unsupported by the record and are erroneous as a matter of law. Consequently, we find the military judge abused his discretion in suppressing the accused's statement and grant the government's appeal.

## CONCLUSION

The appeal of the United States pursuant to Article 62 of the Uniform Code of Military Justice, 10 U.S.C. § 862 is GRANTED. The ruling of the military judge that the accused's confession was involuntary is VACATED, the automatic stay of proceedings is lifted, and the record will be returned to the military judge for action not inconsistent with this opinion.

Senior Judge POND and Judge STEELE, concur.

FOR THE COURT:

JAMES W. HERRING, JR.
Clerk of Court